# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 15, 2021      Decided December 28, 2021

No. 20-7091

PAO TATNEFT,
APPELLEE

v.

UKRAINE, C/O MR. PAVLO PETRENKO, MINISTER OF JUSTICE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00582)

———

*Maria Kostytska* argued the cause for appellant. With her on the briefs was *Geoffrey P. Eaton*.

*Mark E. McDonald* argued the cause for appellee. With him on the brief were *Jonathan I. Blackman* and *Matthew D. Slater*.

Before: SRINIVASAN, *Chief Judge*, and HENDERSON, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Pao Tatneft (Tatneft), a Russian company, filed a petition in district court to confirm and enforce its arbitral award against Ukraine. The district court granted the petition, rejecting Ukraine's arguments that the court should have declined to enforce the award under The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention), June 10, 1958, 21 U.S.T. 2517, and should have dismissed the petition on the basis of *forum non conveniens*. As explained *infra*, we agree with the district court and affirm its judgment.

## I.   BACKGROUND

In July 1995, the Republic of Tatarstan (Tatarstan) and Ukraine founded the CJSC Ukrtatnafta Transnational Financial and Industrial Oil Company (Ukrtatnafta), a joint-stock company that owns and operates Kremenchug, a Ukrainian oil refinery. Ukrtatnafta had three major shareholders: Tatarstan, Tatneft and Ukraine. Tatneft had close ties to the Russian government and Tatarstan is a Russian republic—i.e., one of Russia's federated states. To ensure equal ownership between Russian and Ukrainian interests, Ukraine owned half of Ukrtatnafta and the two Russian entities, Tatneft and Tatarstan, owned the other half. Securing their respective ownership stakes, Ukraine agreed to contribute the oil refinery, Tatarstan, the rights to its region's oil deposits and Tatneft, $180.9 million in oil-related capital assets. Ukraine contributed the oil refinery but Tatneft and Tatarstan failed to make their promised contributions. Tatneft instead contributed $31 million in cash and had its ownership stake reduced by 57%, as approved by Ukrtatnafta's shareholders.

In 1998 and 1999, Ukrtatnafta sold share offerings to AmRuz Trading Co. (AmRuz) and Seagroup International Inc.

(Seagroup). AmRuz and Seagroup agreed to issue promissory notes in exchange for the shares. Media sources have since reported that, at the time of the transaction with Ukrtatnafta, Tatneft executives owned AmRuz and Seagroup. AmRuz, Seagroup, Tatarstan and Tatneft then entered into a Russian voting alliance, eventually formalized through an agreement in October 2006, that controlled 55.7% of Ukrtatnafta's shares.

Beginning in 2001, private and public Ukrainian actors challenged AmRuz and Seagroup's share purchases, arguing that Ukrainian law prohibited the purchase of shares with promissory notes. While this litigation was ongoing, Tatneft purchased AmRuz and Seagroup. After a series of lawsuits, the Kyiv (Ukraine) Economic Court invalidated the share purchases and ordered AmRuz and Seagroup to return their shares to Ukrtatnafta.

A Ukraine conglomerate, the Privat Group, then acquired a small share in Ukrtatnafta. The Privat Group initiated further litigation that resulted in the Economic Court of the Poltava Region, another Ukrainian court, forcing Ukrtatnafta to sell the returned shares at auction. The court did not inform Tatneft, AmRuz or Seagroup about the impending sale. The Privat Group was the sole bidder and purchased the shares.

On May 21, 2008, Tatneft served Ukraine with a Notice of Arbitration and Statement of Claim pursuant to the Russia–Ukraine Bilateral Investment Treaty. *See* Russia–Ukraine Bilateral Investment Treaty, Russ.-Ukr., Nov. 27, 1998. Tatneft claimed that Ukraine, including the Ukrainian courts, improperly facilitated the Privat Group's acquisition of Ukrtatnafta shares and sought damages for unpaid oil deliveries. In accordance with the Russia–Ukraine Bilateral Investment Treaty, each party appointed an arbitrator. *Id.* art.

10. The party-appointed arbitrators then appointed the third arbitrator, Professor Francisco Orrego Vicuña.

In an initial jurisdictional proceeding, Ukraine argued that the arbitral tribunal lacked jurisdiction because Tatneft could not raise claims on behalf of AmRuz and Seagroup. The tribunal disagreed and affirmed its jurisdiction of the dispute. The parties submitted merits arguments but before the tribunal issued its final decision, both Tatneft's law firm (Cleary Gottlieb Steen & Hamilton LLP) and Ukraine's law firm (King & Spalding LLP) had appointed Vicuña as an arbitrator in separate matters. The Russia–Ukraine Bilateral Investment Treaty incorporates the United Nations Commission on International Trade Law's (UNCITRAL) arbitration rules. *Id.* art. 9(2)(c). Under UNCITRAL rules, Vicuña had to notify all parties to the Tatneft-Ukraine arbitration about his subsequent appointments if the appointments raised "justifiable doubts" about his impartiality. UNCITRAL Arbitration Rules, art. 9, G.A. Res. 31/98, U.N. Doc. A/RES/31/98 (Dec. 15, 1976). Vicuña did not inform either party that he had accepted an arbitral appointment from the other party's counsel.

The tribunal issued its "Final Award" in July 2014. *Tatneft v. Ukraine*, 2017 WL 3311265 (July 19, 2014) (Brower, Lalonde, Vicuña, Arbs.). It concluded that Ukraine acted improperly, primarily due to the Ukrainian litigation's procedural defects, thereby depriving Tatneft of its shares in Ukrtatnafta. It awarded Tatneft $112 million in damages and denied Tatneft's claims for unpaid oil deliveries. Ukraine unsuccessfully attempted to annul the Final Award in the Court of Appeal of Paris, which—as the arbitration panel sat in France—had the power to annul the award under the New York Convention. *See* New York Convention art. V(1)(e) (award may be "set aside or suspended by a competent authority of the country in which . . . that award was made"). In 2017 Tatneft

sued to enforce the Final Award, both in the United Kingdom and in the United States District Court for the District of Columbia. *See id.* art. IV(1) (party may apply "for recognition and enforcement" of award). In district court, Ukraine moved to dismiss Tatneft's suit on the basis of Ukraine's sovereign immunity and under the doctrine of *forum non conveniens*. The district court rejected both claims. It held that the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1604, did not apply based on the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6), as well as the waiver exception, *id.* § 1605(a)(1). *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 190 (D.D.C. 2018). Regarding the *forum non conveniens* ground, it held that "no alter[n]ative forum . . . has jurisdiction to attach the commercial property of a foreign nation located in the United States." *Id.* at 192–93. On interlocutory appeal, *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1025 (D.C. Cir. 1997) (collateral order doctrine extends to denial of motion to dismiss on sovereign immunity ground), this court affirmed the district court on the sovereign immunity claim and declined to exercise pendent jurisdiction of the *forum non conveniens* claim. *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam), *cert. denied sub nom. Ukraine v. Tatneft*, 140 S. Ct. 901 (2020).

On February 13, 2020, Ukraine moved for supplemental briefing on whether AmRuz and Seagroup had illegally purchased their shares with promissory notes. If true, the parties presumably did not consent to arbitrate the dispute pursuant to the Russia–Ukraine Bilateral Investment Treaty. *See* art. 1 (no consent to arbitrate "illegal" investments). The district court could then deny enforcement under the New York Convention. *See* New York Convention art. V(1)(c) (court may deny enforcement if parties have not consented to arbitration). The district court denied the motion because Ukraine did not explain its failure to make the argument timely.

The district court then granted Tatneft's petition on the merits, enforcing the arbitral award under the New York Convention. *Pao Tatneft v. Ukraine*, 2020 WL 4933621 (D.D.C. Aug. 24, 2020). Ukraine had opposed enforcement because Vicuña failed to disclose his outside appointments and thus violated the UNCITRAL rule that he disclose any appointment raising "justifiable doubts" about his impartiality, UNCITRAL Arbitration Rules, art. 9, and because enforcement violated the U.S. policy against illegality, *see United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("a court may refuse to enforce contracts that violate law or public policy"), as AmRuz's and Seagroup's purchase of their shares via promissory notes allegedly violated Ukrainian law. The district court rejected both arguments. On the arbitrator bias claim, it held that Vicuña did not have an obligation to disclose a "single" arbitral appointment and that he had not evinced any partiality in ruling for Tatneft. *Pao*, 2020 WL 4933621, at *7–9. On the public policy-against-illegality claim, it held that Ukraine failed to carry its "substantial burden" because it did not identify a specific public policy that enforcement would violate. *Id.* at *9–10.

Ukraine timely appealed. This court then held the appeal in abeyance pending the district court's decision regarding prejudgment interest. Order of January 19, 2021 *in Pao Tatneft v. Ukraine*, No. 20-7091 (D.C. Cir. 2021). The district court subsequently awarded prejudgment interest and ordered Ukraine to pay nearly $173 million in damages. Ukraine timely filed an amended notice of appeal.

We have jurisdiction of the August 24, 2020 final order pursuant to 28 U.S.C. § 1291. Our jurisdiction also extends to the interlocutory rulings that preceded the district court's entry of final judgment. *Ciralsky v. C.I.A.*, 355 F.3d 661, 668 (D.C.

Cir. 2004). We therefore also have jurisdiction of the March 19, 2018 interlocutory ruling on *forum non conveniens*.

## II.  ANALYSIS

Ukraine argues that the district court should have denied enforcement under the New York Convention or, in the alternative, should have dismissed the case on *forum non conveniens*. The New York Convention in general requires American courts to enforce international arbitral awards. *See* 9 U.S.C. § 207 ("court shall confirm [foreign arbitral] award[s] unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention"). Under the Convention, however, a court may deny enforcement if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration," New York Convention, art. V(1)(c), if "[t]he composition of the arbitral authority . . . was not in accordance with the agreement of the parties," *id.*, art. V(1)(d), or if enforcement would be "contrary to the public policy of that [court's] country," *id.*, art. V(2)(b). Under the *forum non conveniens* doctrine, a court may decline to exercise jurisdiction if it determines it is an inappropriate forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504–05 (1947).

"We review a district court's confirmation of an arbitration award for clear error with respect to questions of fact and de novo with respect to questions of law." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 355 (D.C. Cir. 2006). We review the district court's denial of supplemental briefing for abuse of discretion. *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 (D.C. Cir. 2008). We also review a *forum non conveniens* determination for abuse of discretion, keeping in mind that "[t]here is a substantial presumption in favor of a plaintiff's choice of forum." *Agudas Chasidei Chabad of U.S.*

*v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008). When a foreign plaintiff seeks review in an American court, however, the presumption applies with less force. *Friends for All Child., Inc. v. Lockheed Aircraft Corp*., 717 F.2d 602, 605 (D.C. Cir. 1983) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981)).

## A. NEW YORK CONVENTION

Ukraine makes three New York Convention arguments: (1) the Convention's exception to enforcement in Article V(1)(c) applies to this dispute; (2) the district court exceeded its authority under the Convention; and (3) the district court incorrectly enforced the arbitral award, rejecting others of the Convention's exceptions to enforcement.

### 1. Whether enforcement of the arbitral award should have been denied under New York Convention art. (V)(1)(C)

Ukraine first argues that the arbitral award should not be enforced because AmRuz and Seagroup acquired the disputed shares in exchange for promissory notes in violation of Ukrainian law. In the Russia–Ukraine Bilateral Investment Treaty, the parties consented to arbitration regarding "investments" but defined that term to exclude illegal purchases. Russia–Ukraine Bilateral Investment Treaty art. 1. If AmRuz and Seagroup in fact acquired their shares through illegal purchases, the parties' consent to arbitrate would be vitiated. The district court could therefore have declined to enforce the arbitral award under the Convention. *See* New York Convention art. V(1)(c) (court may deny enforcement if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration"). The district court declined to reach this argument because Ukraine

did not timely raise it. We likewise decline to reach the argument.

Ukraine did not make this argument in its initial responses to Tatneft's petition to confirm the arbitral award. By asserting that AmRuz and Seagroup acquired shares in violation of Ukrainian law, Ukraine alleged the necessary condition for the claim. But Ukraine did not connect the dots and explain how Article V(1)(c) of the New York Convention therefore allows the district court not to enforce the arbitral award. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

Ukraine admitted by implication that it failed to raise the argument when it moved for supplemental briefing on the question. The district court denied that motion. As the district court explained, Ukraine offered no reason that it could not have raised the argument much earlier in the litigation. On appeal, Ukraine claims that supplemental briefing would have been "helpful" or "efficient." As noted, we review a denial of supplemental briefing under the abuse of discretion standard. *Cal. Valley Miwok Tribe*, 515 F.3d at 1266. We do "not substitute our judgment for that of the trial court, . . . determining whether we would have reached the same conclusion." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) (citation and internal quotation marks omitted). We instead review whether the district court exceeded its "range of choice" or made a "mistake of law." *United States v. Volvo Powertrain Corp.*,758 F.3d 330, 345 (D.C. Cir. 2014) (citation omitted). The district court neither exceeded its discretion nor made legal error when it denied Ukraine's motion for supplemental briefing, made years after the parties had initially briefed the merits.

Although we have discretion to consider an issue for the first time on appeal, we exercise it only in "exceptional circumstances." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992). No such circumstance exists here. Ukraine contends that a significant monetary judgment against a foreign government could upset international relations but we have not accepted that argument if the judgment would not threaten the stability of the foreign government. *See Acree v. Republic of Iraq*, 370 F.3d 41, 58 (D.C. Cir. 2004) ("The circumstances of this case are even more extraordinary when one considers the stakes: Appellees have obtained a nearly-billion dollar default judgment against a foreign government whose present and future stability has become a central preoccupation of the United States' foreign policy."). The record reflects that Ukraine can pay the $173 million judgment without risking a collapse.

## 2. Whether the district court exceeded its authority under the New York Convention

Ukraine next argues that the district court exceeded its authority under the Convention by modifying the Final Award. Although the Convention plainly authorizes the district court to recognize and enforce an arbitral award, New York Convention art. III; *see also* 9 U.S.C. §§ 201, 207, other courts have held that they lack the power to *modify* an arbitral award. *See Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 747 (5th Cir. 2008) (court lacks subject-matter jurisdiction over "claims seeking to . . . modify a foreign arbitral award").

The "modification" Ukraine challenges arises from the Final Award's provision of differing principal damages in its analysis section and in its "dispositif." In French law, the dispositif is "the operative provisions of the judgment." *See*

*Dispositif*, ENCYCLOPEDIC DICTIONARY OF INTERNATIONAL LAW (3d ed. 2009). Accordingly, Ukraine argues, the district court necessarily "modified" the Final Award by choosing the award amount included in the dispositif and, in effect, nullifying the portion of the analysis that includes different principal damages. For its part, Tatneft disputes that the Final Award has any inconsistency and contends that this court should treat the "dispositif" as the binding provision.

We need not reach the question of how to interpret a contradictory arbitral award because the Final Award is not internally inconsistent. The arbitral tribunal calculated the total amount that Tatneft paid for its 22.7% equity stake in Ukrtatnafta ($112 million) as one measure of the total value of Tatneft's shares. J.A. 245–46. Other estimates—including the amount the Privat Group paid for its shares—confirmed the $112 million evaluation. J.A. 245. The arbitral panel applied the evaluation for the total 22.7% shareholding to both the "14.09% indirect shareholding . . . which [Tatneft] held through AmRuz and Seagroup" and Tatneft's "8.61% direct shareholding in Ukrtatnafta." J.A. 249. Accordingly, the arbitral panel held "that interest shall begin to accrue on the amount of US$ 68.44 million [from the date Tatneft was deprived of its indirect shareholdings], and on the amount of US$ 43.56 million [from the date Tatneft was deprived of its direct shareholdings]." J.A. 249. Ukraine argues that the Final Award elsewhere defines the principal sums as $81 million and $31 million—the amounts Tatneft in fact paid for its indirect and direct shareholdings, with a higher per share price for the indirect transaction. But the arbitral tribunal did not award damages to restore what Tatneft paid for its shares. Instead, it estimated the per share value of Ukrtatnafta itself (in part by looking at what Tatneft paid, on average, per share) and awarded damages according to the estimated value of the taking from Tatneft. Because the Final Award does not reflect

any award inconsistency, the district court did not exceed its jurisdiction by issuing its enforcement judgment.

### 3.   Whether other New York Convention enforcement exceptions apply

Ukraine also argues that the district court mistakenly enforced the arbitral award, in spite of the New York Convention's "public policy" and "improper composition" exceptions. *See* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."). We reject both arguments.

### A. Public Policy Exception *(New York Convention art. V(2)(b))*

Ukraine contends that the district court erroneously enforced the award because enforcement would violate the U.S. policy against illegality. *See* New York Convention, art. V(2)(b) (court may deny enforcement if "enforcement of the award would be contrary to the public policy of [the court's] country"). "The public policy defense is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (citation omitted). Ukraine asserts that AmRuz and Seagroup acquired their shares in Ukrtatnafta using promissory notes in violation of Ukrainian law. Ukraine thus argues that the district court should decline to enforce the award under Article V(2)(b) because enforcement would violate U.S. policy. Even assuming *arguendo* that AmRuz and Seagroup's share purchases violated Ukrainian law, enforcement did not violate U.S. public policy.

Ukraine's argument fails because the U.S. does not have a policy against enforcing arbitral awards predicated on underlying violations of foreign law. Under the common law, a court "may refuse to enforce contracts that violate law or public policy." *United Paperworkers*, 484 U.S. at 42. As applied to a *domestic* arbitral award, the doctrine extends to an "arbitrator's *interpretation* of . . . [a] contract[] . . . where the contract as interpreted would violate" a public policy. *Id.* at 43 (emphasis in original). But a party does not necessarily "found[] a cause of action upon an immoral or illegal act" if it seeks to enforce an arbitral award as to which some underlying activity was illegal. *Cf. id.* at 43–45 (court enforced arbitration decision reinstating employee discharged for illegal drug use). The parties have already litigated and arbitrated their claims on the merits; now they argue about whether the U.S. can enforce the award. If Ukraine wanted to raise claims about the illegality of the share purchases and the arbitral panel's jurisdiction, it had the opportunity to raise those claims before the arbitral panel. *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 208 (D.C. Cir. 2015) (parties "consented to allow the arbitral tribunal to decide issues of arbitrability—including whether [the parties] had 'investments' within the meaning of the treaty"). We need consider only whether U.S. public policy would be violated by enforcing the arbitral award. Because Ukraine does not offer any argument that the arbitration tribunal interpreted the Russia–Ukraine Bilateral Investment Treaty in such a manner as to violate U.S. public policy, the district court was without authority to apply the New York Convention's public policy exception.

## B. Improper Composition Exception *(New York Convention art. V(1)(d))*

Ukraine next argues that the district court should have denied enforcement because Vicuña failed to disclose that

Tatneft's law firm appointed him to another arbitration panel. "Recognition and enforcement of the award may be refused" if "[t]he composition of the arbitral authority . . . was not in accordance with the agreement of the parties." New York Convention, art. V(1)(d). The parties' agreement incorporates the UNCITRAL rules. *See* Russia–Ukraine Bilateral Investment Treaty art. 9(2)(c) ("[T]he dispute shall be referred to be considered by . . . an ad hoc arbitration tribunal in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)."). The UNCITRAL rules require an arbitrator to disclose "any circumstances likely to give rise to justifiable doubts as to his impartiality or independence." UNCITRAL Arbitration Rules, art. 9. Accordingly, if Vicuña failed to disclose circumstances creating "justifiable doubts" about his impartiality, the "composition of the arbitral authority" would not have been "in accordance with the agreement of the parties." Unlike in the domestic arbitral context, the district court did not need to find that Vicuña in fact evinced "evident partiality." *Cf. Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1112 (D.C. Cir. 2017).[1]

We conclude that Ukraine has not shown that the appointment "give[s] rise to justifiable doubts as to [Vicuña's] impartiality or independence." Although an arbitrator should promote openness in disclosing other arbitral appointments or any outside contact with a party's counsel, we do not interpret the "justifiable doubts" standard to require a searching review of an arbitrator's ethics. *Cf. id.* at 1112 ("Article V(2)(b) does not require a fly-specking of the ABA Model Rules of

---

[1] We note that the district court read *Belize Bank* to hold that parties may challenge an arbitrator's bias only under New York Convention art. V(2)(b) (public policy exception). *Belize Bank* limited its analysis to the public policy exception simply because it was the only claim that "warrant[ed] further discussion." *Belize Bank*, 852 F.3d at 1109.

Professional Conduct."). And we do not think that Vicuña's failure to disclose raises any question of his impartiality.

In applying the "justifiable doubts" standard, we look to the *International Bar Association Guidelines on Conflicts of Interest in International Arbitration* (2004) (IBA Guidelines) as authority on the ethics of international arbitrators. *Cf., e.g.*, *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1110 (9th Cir. 2007) (court "considered" IBA Guidelines). The IBA Guidelines identify conduct that will and will not raise "justifiable doubts." The "Red List" identifies situations that "give rise to justifiable doubts as to the arbitrator's impartiality and independence." IBA Guidelines pt. II, § 2. The "Orange List" identifies situations that "may . . . give rise to doubts as to the arbitrator's impartiality or independence." *Id.* pt. II, § 3. Situations not identified in the Orange List, however, "are generally not subject to disclosure" but might raise justifiable doubts depending on specific factual circumstances. *Id.* pt. II, § 6. And the "Green List" identifies "situations where no appearance of, and no actual, conflict of interest exists from the relevant objective point of view. Thus, the arbitrator has no duty to disclose situations falling within the Green List." *Id.* pt. II, § 7.

The IBA Guidelines do not address the specific conduct here—accepting an arbitral appointment from one party's counsel—but the included examples suggest that Vicuña's conduct falls somewhere between the "Green List" and the "Orange List." The "Green List" includes "initial contact with a party's . . . counsel[,] prior to appointment" about "availability and qualifications" to serve. *Id.* pt. II, art. 4.4.1. The "Orange List" addresses circumstances in which an "arbitrator has within the past three years been appointed as arbitrator on two or more occasions by . . . an affiliate of one of the parties," including counsel, *id.* pt. II, art. 3.1.3, and

circumstances in which "[t]he arbitrator has, within the past three years, been appointed on more than three occasions by the same counsel, or the same law firm," *id.* pt. II, art. 3.3.7. Vicuña accepted only one appointment from Tatneft's law firm (indeed, neither law firm appointed Vicuña to this Tatneft-Ukraine tribunal), leaving his conduct outside the "Orange List." But his conduct goes beyond the "Green List" because his contact was not "limited to [discussing] the arbitrator's availability and qualifications to serve"—Vicuña in fact accepted the appointment.

Even under a strict interpretation of the IBA Guidelines, we think that Vicuña did not have a duty to disclose. Situations not identified in the Orange List "are generally *not* subject to disclosure." IBA Guidelines, pt. II, § 6 (emphasis added). Ukraine does not identify any additional reason to doubt Vicuña's impartiality, such as an unusually lucrative fee or an unusually prestigious appointment. And we note that Vicuña accepted a separate arbitral appointment from the law firms for *both* parties, arguably relieving doubt about his impartiality.

Vicuña, a well-known arbitrator, followed an apparently common practice. *See Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.,* 164 F. Supp. 3d 457, 479–80 (S.D.N.Y. 2016) ("it cannot be that selection and payment for a person's services as a party-arbitrator or umpire, without more, produces a 'material or commercial financial relationship' sufficient to constitute disqualifying partiality [because if] it did, the entire commercial arbitration system, which universally uses such procedures, would be undermined") (citation omitted), *aff'd*, 675 F. App'x 89 (2d Cir. 2017). Indeed, other courts have found no ethical breach. The Court of Appeal of Paris concluded that "a single appointment in the course of the seven years that the arbitration lasted, which did not characterize a history of business between this arbitrator and this law firm,

[did not have] the potential to raise a reasonable doubt about the independence and impartiality of Mr Orrego Vicuña." J.A. 349. The United Kingdom's High Court of Justice "d[id] not consider that it can at all be said that a single appointment in the course of the seven years the arbitration lasted would or might provide the basis for a reasonable apprehension about the independence or impartiality of Professor Vicuña; and still less that they were likely to give rise to justifiable doubts so as to trigger the duty of disclosure." J.A. 996. Nonetheless, we emphasize the narrowness of our holding—Vicuña was not required to disclose his appointment because it did not raise "justifiable doubts" regarding his impartiality.

## B. *FORUM NON CONVENIENS*

Finally, Ukraine maintains that the district court should have dismissed the case under the doctrine of *forum non conveniens*. "A *forum non conveniens* dismissal . . . is a determination that the merits should be adjudicated elsewhere," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007), "even when jurisdiction is [otherwise] authorized," *see Gilbert*, 330 U.S. at 507. "In deciding forum non conveniens claims, a court must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *Agudas Chasidei Chabad*, 528 F.3d at 950. Ukraine argues that the parties should litigate this case in Ukraine, the locus of both the controversy and the major portion of the assets with which Ukraine would satisfy any judgment. But we have squarely held "that *forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 876 n.1 (D.C. Cir. 2021) (citing *TMR Energy Ltd. v. State Prop. Fund of*

*Ukraine*, 411 F.3d 296, 303–04 (D.C. Cir. 2005)). For that reason, no adequate alternative forum outside the U.S. exists. The rule applies even if the defendant "currently has no attachable property in the United States, [as] it may own property here in the future." *TMR*, 411 F.3d at 303.

Ukraine argues that our decisions in *Moldova* and *TMR* run afoul of the Supreme Court's *Sinochem* decision. In *Sinochem*, a Chinese corporation successfully filed suit in the Guangzhou Admiralty Court, China's maritime court, against a Malaysian shipping corporation. 549 U.S. at 426. The Malaysian shipping corporation filed a countersuit in the Eastern District of Pennsylvania seeking damages from the Chinese corporation for negligent misrepresentations made in the Chinese court. *Id.* at 427. The district court dismissed on the *forum non conveniens* ground. *Id.* at 427. The Supreme Court recognized that a district court may sometimes address a *forum non conveniens* claim before affirming its jurisdiction because resolving a *forum non conveniens* motion does not require the court to assume a "substantive 'law-declaring power.'" *Id.* at 433 (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). But *Sinochem* does not address the relevant issue here: namely, whether an adequate alternative forum exists if a party seeks to attach assets located in the U.S.

For the foregoing reasons, we affirm the judgment of the district court enforcing the arbitration award against Ukraine.

*So ordered.*