**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1144**

---

ESTATE OF KE ZHENGGUANG,

       Plaintiff/Petitioner - Appellee,

     v.

YU NAIFEN STEPHANY, a/k/a Stephany Yu, a/k/a Stephany Naifen Yu, a/k/a Stephany N. Dombrowski,

       Defendant/Respondent - Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, U.S. District Judge (8:18-cv-03546-PX; 8:20-cv-02260-PX).

---

Argued:  March 19, 2024                    Decided:  June 27, 2024

---

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

---

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Agee joined.

---

**ARGUED:**  Charles Michael, STEPTOE LLP, New York, New York, for Appellant. Amiad Moshe Kushner, SEIDEN LAW LLP, New York, New York, for Appellee.  **ON BRIEF:**  Jennifer Blecher, Xintong Zhang, SEIDEN LAW LLP, New York, New York, for Appellee.

NIEMEYER, Circuit Judge:

The Estate of Ke Zhengguang commenced this action against Stephany Yu to enforce an arbitral award entered in its favor against Yu on February 28, 2018, by an arbitration panel in Hong Kong. The award was entered following a lengthy arbitration proceeding commenced in Hong Kong to resolve business disputes among several parties involving real property in China. As part of its award, the Hong Kong panel ordered Yu and her two sisters, jointly and severally, to pay the Estate and Xu Hongbiao 10,346,211 Renminbi ("RMB," China's official currency), which was roughly equivalent to $1.63 million, for the losses they sustained. The panel subsequently issued supplemental awards adding attorneys fees, arbitration fees, and interest.

After Yu had paid Xu his one-half share of the damages awarded, the Estate brought this action against Yu, who is a U.S. citizen residing in Maryland, to collect the other half.

The district court confirmed the award under the New York Convention, a treaty to which the United States and Hong Kong are signatories, which provides for the recognition and enforcement of foreign arbitral awards, and it entered judgment in favor of the Estate against Yu in a total amount of $3.6 million, which included attorneys fees, costs, and pre-award interest. The damages component of the award in U.S. dollars was based on the currency exchange rate as of February 28, 2018 — the date of the original arbitration award.

On appeal, Yu contends that the district court erred in failing to grant her motion to dismiss the enforcement proceeding, arguing (1) that the district court in Maryland was a *forum non conveniens*; (2) that the Estate failed to join necessary, indeed indispensable,

2

parties to the arbitration proceeding, as required by Federal Rule of Civil Procedure 19; and (3) that the enforcement of the award would violate Chinese currency control laws and thereby violate the United States' policy favoring international comity, which is a specified defense in the New York Convention. She also contends that the district court should have entered judgment in RMB, as provided in the arbitral award, not in U.S. dollars.

For the reasons that follow, we find none of Yu's arguments regarding the damages she owes persuasive and accordingly affirm.

## I

In the early 2000s, Stephany Yu and her two sisters entered into a business partnership with Xu Hongbiao and Ke Zhengguang with the purpose of buying and developing real estate in China. Together, the five partners formed Oasis Investment Group Limited, a company incorporated in the British Virgin Islands. Xu and Ke held non-controlling interests in Oasis, each holding 16.6% of its shares, while Yu and her two sisters collectively held a controlling interest, holding respectively 49%, 16.6%, and 1% of its shares.

In 2010, the five Oasis partners decided to restructure their arrangement, executing an agreement detailing how they would divide their interests with payments of cash, transfers of stock, and transfers of property. The agreement included an arbitration clause, providing that any disputes arising out of the agreement would be resolved by arbitration in the Hong Kong International Arbitration Center under Hong Kong law.

3

Over the next few years, despite the partners' efforts, the partners were unable to agree on how to implement their 2010 agreement.  Accordingly, in February 2013, Xu and Ke filed a notice of arbitration against Oasis, Yu, and her two sisters in Hong Kong.  During the course of the arbitration proceedings, Ke died, and the arbitration panel substituted as a claimant the Estate of Ke (administered by Ke's wife and daughter).  Years later, on February 28, 2018, the arbitration panel issued a final arbitral award, ordering the transfers of properties, the transfers of stock, and the payment of money.  Specifically, the award contained nine orders.  Orders 1 and 2 provided for transfers of real property; Orders 3 and 4 provided for the settlement of intra-company debts and compliance with audit requirements; Orders 5, 6, and 7 provided for transfers of stock; Order 8 required the four arbitral respondents to make specified payments to Xu and the Estate of Ke; and Order 9 ordered Yu and her two sisters, jointly and severally, to pay Xu and the Estate RMB 10,346,211, "as compensation for their losses," one-half to each.

Thereafter, Yu paid Xu his portion of the damages awarded in Order 9 by having an Oasis subsidiary wire money to an account that Xu held in a bank in China.  While Yu was also willing to pay the Estate its share with a check drawn on a bank in China, the Estate refused payment in that form because the money would become subject to Chinese currency laws if the Estate attempted to move it to Hong Kong or elsewhere.  It took the position that Yu must provide the Estate payment that could be deposited into its Hong Kong bank account, where the arbitration award was issued.

To enforce the award against Yu, the Estate commenced this action under the New York Convention in the federal district court in Maryland, where Yu resides and has resided

4

since 2016. The Estate requested judgment confirming Order 9 of the arbitration award and enforcing it in U.S. dollars equivalent to RMB 5,173,105.50, representing one-half of the payment due under Order 9 of the arbitration award, plus interest and attorneys fees.

Shortly after the Estate filed this action, the Hong Kong arbitration panel issued a clarification making a procedural change to Order 2 and a name change to Order 7. The Estate thereafter filed an amended petition in the district court seeking not only the payment required by Order 9, but also confirmation of the obligations delineated in Orders 1 through 8. And with respect to Order 9, the Estate included a request for both pre-judgment and post-judgment interest. In its amended petition, the Estate alleged that it was "unable to negotiate any RMB-denominated payments that are drawn on a [People's Republic of China] bank," because such a bank could not, under China's currency laws, freely send money to the Estate's bank in Hong Kong. It alleged, however, that it was willing to accept payment in RMB by check so long as the check could be deposited in a bank in Hong Kong. Yu refused to provide payment in that form.

Yu filed a motion to dismiss the petition, as amended, contending (1) that the district court was a *forum non conveniens*; (2) that the Estate failed to join necessary parties, as required by Federal Rule of Civil Procedure 19; and (3) that the district court should decline to enforce the award under the Convention's public policy exception, as Yu's offshore payment of the judgment would run contrary to China's currency control laws and therefore violate the United States' public policy of international comity. She also urged that, if a money judgment requiring payment for Order 9 were to be entered, the court should enter it in RMB rather than U.S. dollars, with instructions that the payment be made in China.

5

By a memorandum opinion dated February 24, 2020, the district court denied Yu's motion to dismiss on all grounds and granted the Estate's amended petition for recognition and enforcement, providing that the entry of judgment be in U.S. dollars. The court noted that the New York Convention "lists seven exclusive defenses to enforcement, and neither *forum non conveniens* nor failure to join necessary parties under Rule 19 is one of them." And denying Yu's public policy defense, the court explained:

> Stephany Yu simply asserts, without citing any authority, that she might be placed at legal risk for potentially violating China's currency control laws if the Court were to require her to pay the Final Award from China to a bank account outside of China. This Court is not being asked to enforce a judgment in China, but rather, in the United States, so any decision in this case would not undermine the interests of China in enforcing its own currency control laws.

Finally, the court determined that its judgment would be in U.S. dollars, as requested by the Estate, recognizing that "[r]ecent cases have endorsed judgment in a foreign currency if the petitioner requests payment in that currency." (Quoting *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 218 (D.C. Cir. 2018)).

The only order of the Hong Kong award that the district court addressed in its memorandum opinion was Order 9, an order for which Yu — the only arbitral respondent who is a party in this enforcement action — was jointly and severally liable. The Estate did not in its briefing pursue any specific performance orders regarding the obligations of the other parties to the arbitration, and the district court did not address such relief against Yu or any other party to the arbitration.

The court directed the parties to submit a proposed judgment implementing the rulings of its memorandum opinion.

6

Before the district court entered final judgment, however, the arbitration panel in Hong Kong issued two supplemental awards addressing fees, costs, and interest. In response, the Estate filed a second action in the district court to enforce those supplemental awards. The parties thereafter stipulated to the consolidation of the two cases and agreed that they would each submit to the court a proposed form for a consolidated judgment to cover both actions. While Yu requested that the court's judgment make clear that it was only enforcing the award insofar as it imposes obligations on Yu, the Estate countered that there was no need for the court to add such language, considering the clear rule that a final judgment only binds parties to the action. (Citing *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)).

On January 9, 2023, the district court entered a consolidated judgment in favor of the Estate in the amount of $3,614,772.78, which included the amount Yu owed under Order 9 of the final arbitration award and the attorneys fees, costs, and pre-award interest as ordered in the 2020 supplemental awards. The judgment in dollars reflected the currency exchange rate as of February 28, 2018, for conversion of the RMB in Order 9, and it reflected other currency exchange rates for the fees and interest awards, as addressed in the 2020 supplemental awards. Finally, the judgment directed the Clerk to close the case.

From the final judgment, Yu filed this appeal, challenging only the portions of the consolidated final judgment that implemented the 2018 final arbitration award. She also deposited roughly $3.8 million with the Clerk of the district court as security for the payment of the judgment.

7

II

The Estate commenced this action to confirm and enforce an arbitration award issued by an arbitral panel in Hong Kong pursuant to the New York Convention — formally, the Convention on the Recognition and Enforcement of Foreign Arbitration Awards, June 10, 1958, 21 U.S.T. § 2517 — to which both Hong Kong and the United States are signatories. The United States implemented the treaty in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq*.

The Convention treats foreign arbitration awards much like the judgment of a court and provides for their enforcement in a similarly simplified proceeding. While it recognizes that any arbitration award may be reviewed and modified as provided by the law and procedure of the country in which the award was issued, when the award is taken to another country for confirmation and enforcement, the issues in dispute and the relief granted are treated as fully resolved. *See, e.g.*, *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 445 (10th Cir. 2023) (observing that "[a] secondary jurisdiction . . . must generally confirm an arbitral award"). Thus, when seeking confirmation and enforcement in another country, the party who obtained the award need only file (1) a certified copy of the arbitration agreement and (2) a certified copy of the award. *See* Convention, art. IV. And in response, the party against whom the foreign award was entered may argue for a refusal of confirmation and enforcement, but "*only* if that party furnishes . . . proof" of one or more of five specified defenses or if the court finds that either of two additional defenses applies. Convention, art. V (emphasis added).

8

The defenses authorized by Article V are that (1) the award is not valid; (2) the respondent was not given proper notice; (3) the award exceeds the scope of the submission to arbitration; (4) the arbitral tribunal was not properly composed; (5) the award is not yet binding; (6) the subject matter in dispute is "not capable of settlement by arbitration" under the law of the issuing country; or (7) "[t]he recognition or enforcement of the award would be contrary to the public policy of that country." Convention, art. V. And under U.S. implementing law, a court will confirm the award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

In light of the Convention's provisions, the procedure for recognizing and enforcing a foreign arbitration award is essentially a stripped-down summary judgment proceeding designed "to encourage the recognition and enforcement of commercial arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974); *see also Reddy v. Buttar*, 38 F.4th 393, 398 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 364 (2022). It is "akin to a motion for summary judgment." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 (2d Cir. 2006). And it is modeled after the procedure for the confirmation and enforcement of domestic arbitration awards under the Federal Arbitration Act. *See* 9 U.S.C. § 208 (providing that Chapter 1 of the Federal Arbitration Act "applies to actions brought under [Chapter 2, which implements the Convention,] to the extent that [that] chapter is not in conflict with this chapter or the Convention"); *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 882 (11th Cir. 2023) (observing that "[c]onfirmation under the [Federal Arbitration Act] is essentially the same as recognition and enforcement under

the New York Convention"). In this posture, "[m]any of the ordinary procedural rules governing civil litigation are inapplicable." *Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 560 (3d Cir. 2022).

Of course, any judicial proceeding is always subject to satisfying jurisdictional requirements and venue. And the Federal Arbitration Act, which implements the Convention, confers jurisdiction and venue to U.S. district courts in accordance with the requirements of "federal question" jurisdiction under 28 U.S.C. § 1331 and traditional personal jurisdiction limitations. *See* 9 U.S.C. §§ 203, 204; *see also Reddy*, 38 F.4th at 398 (regarding subject matter jurisdiction); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory*," 283 F.3d 208, 212 (4th Cir. 2002) (regarding personal jurisdiction).

Against this structure, Yu has advanced three defenses to deny the Estate recognition and enforcement of the Hong Kong award. Two are the procedural defenses of *forum non conveniens* and failure to join necessary parties under Rule 19. And the third is a public policy defense recognized by the Convention, which authorizes the refusal to recognize and enforce an award when doing so "would be contrary to the public policy of that country." Convention, art. V(2)(b). We now turn to address these defenses.

A

Yu contends first that this proceeding is a "selective enforcement against [her] *personally* for recovery of what were fundamentally corporate obligations" and therefore that the district court should have at least considered her procedural defenses of *forum non conveniens* and failure to join necessary parties. She characterizes the district court in

10

Maryland as a "highly suspicious forum," which "cannot reach the other parties" to the arbitration. She argues that Hong Kong is the appropriate forum for litigating the issues, where all parties are subject to the jurisdiction of the court.

In response to the district court's conclusion that *forum non conveniens* — and for that matter, Rule 19 — is not a defense available in a proceeding brought under the Convention, Yu argues that Article III of the Convention authorizes interposing procedural defenses by stating in relevant part, "Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance *with the rules of procedure* of the territory where the award is relied upon, under the conditions laid down in the following articles." Convention, art. III (emphasis added). She notes that the *forum non conveniens* defense has been referred to as a rule "of procedure rather than substance," *American Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994), and, of course, Rule 19 is by definition a rule of procedure.

If the Convention does indeed make the defense of *forum non conveniens* available, the defense would permit federal courts, as a matter of discretion, to dismiss a recognition and enforcement proceeding if there were an alternative forum that was (1) "available," (2) "adequate," and (3) "more convenient in light of the public and private interests involved." *Jiali Tang v. Synutra Int'l Inc.*, 656 F.3d 242, 248 (4th Cir. 2011) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)). The doctrine is designed to remedy the challenges of trying a case in an inconvenient forum. But recognizing and enforcing an arbitration award is not trying a case in the typical sense, and such inconveniences are hardly ever at issue due to the limited nature of the proceeding. In confirmation

11

proceedings under the New York Convention, there is no case to try, only a binding award to recognize and enforce. *See Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) ("Confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm").

For the purposes of enforcing Order 9, the district court in Maryland is surely an appropriate forum that fully satisfies any convenience concerns for such a limited proceeding. Yu is a U.S. citizen who resides in Maryland, and she has assets there that are available to satisfy a judgment. Indeed, with respect to the judgment in this case, Yu deposited the amount of judgment with the Clerk of the district court to secure payment of the judgment upon exhaustion of her appeal. While it might well be that the defense of *forum non conveniens* is not available under the Convention — as the district court concluded, noting that the Convention lists seven defenses as *the exclusive* defenses to such a proceeding — we need not decide that question in the context of this particular proceeding, where the Maryland forum is a most suitable forum for the Estate's enforcement of the award against Yu.

To be sure, in circumstances far different than those presented here, the Second Circuit has held that *forum non conveniens* can serve as a defense under the Convention. *See In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 496 (2d Cir. 2002); *Figueiredo Ferraz e Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 385 (2d Cir. 2011). In *Monegasque*, the court affirmed the dismissal of a petition to enforce an arbitral award issued in Moscow against a natural

12

gas transporting company owned by the Ukrainian government. 311 F.3d at 491. While Naftogaz alone had assumed the rights and obligations of the arbitral debtor, the petitioner sought to enforce the award in the United States against both Naftogaz and against the State of Ukraine, which had not signed on to the arbitration agreement. *Id*. at 491–92. When assessing whether *forum non conveniens* should be a defense to the enforcement of the award in the United States, the court considered the administrative difficulties of enforcing the award in the particular circumstances before it, noting that the parties had no ties with the United States and that the more appropriate forum for enforcement was in Ukraine. *Id*. at 495–97; *see also id*. at 499 ("[I]t is clear that the jurisdiction provided by the Convention is the only link between the parties and the United States").

*Figueiredo* likewise involved a petitioner seeking judgment against a foreign government in the United States. A Brazilian company had contracted with a Peruvian state agency responsible for water supply and sanitation. 665 F.3d at 387. After a fee dispute arose, the parties arbitrated the issues in Peru, and the arbitral tribunal awarded Figueiredo more than $21 million. *Id*. A Peruvian statute, however, limited the amount the state agency could pay to satisfy the judgment to $1.4 million. *Id*. at 387–88. Figueiredo brought a petition to enforce the award in a U.S. district court, pursuant to the Panama Convention, which is similar to the New York Convention, and the district court denied Peru's motion to dismiss based on *forum non conveniens*. The Second Circuit, however, reversed. It held that the proceeding should have been dismissed under the doctrine of *forum non conveniens*, emphasizing the barrier to enforcement erected by the Peruvian statutory cap and stating that there is "a public interest in assuring respect for a

13

foreign sovereign nation's attempt to limit the rate at which its funds are spent to satisfy judgments." *Id*. at 392.

In each of these cases, the court was presented with the challenge of enforcing an arbitral award against a foreign sovereign in the United States, a task raising the significant foreign policy question of whether a U.S. court can and should enter a judgment that places a demand on a foreign government.

This case, however, raises no such issues. Indeed, this proceeding involves the straightforward attempt to enforce a foreign arbitration award in a U.S. court against an arbitral debtor within the U.S. court's jurisdiction and with assets there. In such circumstances, the D.C. Circuit has held that "*forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 876 n.1 (D.C. Cir. 2021) (citing *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303–04 (D.C. Cir. 2005)). The principle underlying that holding naturally applies here where the Estate is entitled to seek recognition and enforcement of the Hong Kong final award by a U.S. court capable of exercising subject-matter jurisdiction and personal jurisdiction over Yu, who has assets within the court's jurisdiction. In the circumstances of this case, the defense of *forum non conveniens* could not apply, even if it were available under the Convention.

Yu nonetheless persists in arguing that the doctrine applies to this case, maintaining that this is not a "typical, run-of-the-mill enforcement case." Rather, she asserts, the award here "involves primarily complicated and vague specific performance directives,"

14

suggesting that "[s]orting out exactly who must take what steps under those vague directives *will* require the Court to receive evidence in the form of documents, witness[] testimony, and the like." But this argument erroneously characterizes the proceeding before us. The Hong Kong arbitration panel sorted out the liabilities among the parties and awarded relief, resolving the various rights and obligations. That relief included a simple order that Yu pay money to the Estate and Xu, and the district court simply entered a money judgment on that basis, rejecting a *forum non conveniens* defense. The specific performance provisions in the arbitration award were not enforced in the court's judgment; as related to the 2018 award, that judgment enforced only Yu's personal obligation under Order 9 to pay money damages to the Estate. In these circumstances, we affirm.

B

Yu also contends that the district court erred in not dismissing the proceeding because of the Estate's failure to join necessary parties under Federal Rule of Civil Procedure 19 — namely, Oasis, her co-obligor, and Xu, the Estate's co-claimant. According to Yu, they were required to be parties "because, without them, the interrelated and sequenced specific performance provisions cannot possibly be enforced in a manner that provides complete relief, or that provides fairness and finality." She observes that, when a court is asked to order specific performance on a contract, all parties that "will be required to act to carry out a court order compelling performance have been held to be" indispensable parties under Rule 19, quoting 7 Charles Alan Wright et al., *Federal Practice and Procedures* § 1613 (3d ed. 2023).

15

But again, Yu mischaracterizes the district court's judgment, which concerns only enforcement of the award against Yu for money she owes the Estate. The Hong Kong arbitration award included nine orders, some of which involve specific performance. The district court's judgment, however, addressed only the money Yu owed to the Estate, which could be claimed only by the Estate. The district court's judgment did not purport to order specific performance of other parties who were outside of the district court's jurisdiction. Moreover, Oasis was not a co-obligor in Order 9. And Xu, who had been paid his one-half share of the damages awarded in Order 9, was no longer a co-claimant. Thus, the Estate as petitioner and Yu as respondent are the only parties necessary for complete relief insofar as Yu's personal obligations under Order 9 are concerned.

In these circumstances, we again need not accept Yu's invitation to consider broadly whether the Convention categorically prohibits arbitration respondents from relying on domestic rules of procedure to defend themselves against enforcement proceedings in the United States because, regardless of the resolution of the question, Rule 19 is simply not implicated here.

C

Yu next contends that the district court should have declined to enforce Order 9 of the final arbitration award under Article V of the Convention because doing so violates the public policy of the United States. Article V provides, as relevant:

> 2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

\* \* \*

16

*(b)* The recognition or enforcement of the award would be contrary to the public policy of that country.

Convention, art. V(2)(b).  Thus, the district court was authorized to refuse to enforce Order 9 if doing so would violate the public policy of the United States.

As Yu explains her public policy argument, she made clear to the Estate that she is "prepared to complete the payment [under Order 9], so long as the Estate will specify a bank account *in China* to receive the funds," but "the Estate has refused."  (Emphasis added).  She continues, as the Estate is "well aware, overseas payments of RMB must be approved by Chinese regulators *before RMB may flow out of China*," and "Chinese law prohibits making or receiving payments in foreign currency where such funds should be collected or paid in [RMB]."  (Emphasis added) (cleaned up).  From those observations, she concludes, without adequately explaining the logical jump, that "[t]he risk for Ms. Yu is that Chinese regulators will consider a judgment payment made in the United States to be a scheme to evade those controls altogether, and to effectively *move money abroad* with no Chinese regulatory oversight."  (Emphasis added).

To bring this claimed legal risk within the ambit of the U.S. public policy, Yu maintains further that enforcing Order 9 in the United States "would violate the fundamental U.S. policy of international comity, which 'refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.'"  (Quoting *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 543 n.27 (1987)).  She argues that the district court should

17

have shown "due respect" for her exposure to the legal risk under Chinese law. (Quoting *id*. at 546).

Yu's argument relies on a misplaced reference to Chinese currency laws. To be sure, as she points out, China controls the outflow of RMB from China as part of its currency management. To this end, it regulates not only the movement of RMB out of China, including the movement of RMB from Chinese banks to banks outside of China, but it also regulates efforts within China to convert RMB transactions into transactions involving foreign currencies, because such conversions could similarly lead effectively to the export of the foreign currencies as a surrogate for the RMB. Thus, she asserts that RMB transactions in China cannot be consummated with the payment of foreign currency. In sum, Yu concludes reasonably that China must approve payments of RMB "before RMB may flow out of China." But all of these observations about Chinese law are irrelevant to the Hong Kong arbitration award and its enforcement in the United States under the New York Convention. The Hong Kong arbitration proceedings and award is not a transaction *in China* that effectively exports currency *from China*.

To engage the Chinese currency principles, Yu assumes that she can discharge her obligation under the Hong Kong award with a check drawn on a Chinese bank. Yet, not only does the money judgment entered by the Hong Kong arbitration panel not require the Estate to accept *a check* in payment, it also does not require the Estate to accept a check *drawn on a Chinese bank*, where currency controls would apply. Order 9 of the Hong Kong award, made under Hong Kong law, orders Yu to pay the Estate *money* denominated

18

in RMB, not a check drawn on a bank, and the money award can, under the Convention, be enforced in any signatory country, including the United States.

Moreover, nothing about an award by a Hong Kong arbitration panel made in RMB violates U.S. public policy. RMB is a widely traded international currency, which may be converted at applicable exchange rates at any large commercial bank. Enforcing the Hong Kong award denominated in RMB is no more violative of U.S. public policy than would be enforcing an award entered in Hong Kong dollars or Australian dollars or Euros. Indeed, it is U.S. public policy to provide for the confirmation of any such award in the United States, in accordance with the terms of the Convention.

To fall within a defense provided by Article V(2)(b) of the Convention, Yu would have to show that enforcement would be "repugnant to fundamental notions of what is decent and just" in the United States. *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981)). And this exception is "construed extremely narrowly." *BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 48 (D.D.C. 2017). Accordingly, an arbitral award debtor seeking "to avoid summary confirmance" bears a "heavy" burden to show that the defense applies. *Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 810 (2d Cir. 2022) (quoting *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005)). Indeed, Yu would need to show that enforcement "would violate the forum state's most basic notions of morality and justice." *Tatneft v. Ukraine*, 21 F.4th 829, 837 (D.C. Cir. 2021) (cleaned up).

19

Yu has not made such a showing.  Moreover, she fails to demonstrate that she can satisfy Order 9 *only* by paying by check from a Chinese account, which would implicate Chinese currency laws.  In short, the Article V defense that Yu invokes provides her with no relief.

### III

Finally, Yu contends that the district court should not have entered judgment in U.S. dollars but rather in RMB, as the arbitral panel denominated the award in Order 9.  She argues that "there should be a 'simple, uniform' rule of entering judgment in the currency the parties chose to deal," which for purposes of Order 9 is RMB.  (Quoting and discussing *In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 954 F.2d 1279, 1329 (7th Cir. 1992)).  Issuing an award in the currency in which the parties dealt, she argues, "accords with principles of fairness and with the goal of making injured parties whole because it provides them with payment in the currency for which they bargained."  (Quoting *Mitsui & Co. v. Oceantrawl Corp.*, 906 F. Supp. 202, 204 (S.D.N.Y. 1995)).  She contends that the Estate "is playing games for a more advantageous result — namely to skirt Chinese currency control laws and avoid Chinese withholding taxes."  (Cleaned up).  As part of her position, she also argues that the RMB should be paid *in China*, such that the transaction would be subject to Chinese currency restrictions.

To start, there is no provision in Order 9 that requires that payment be made in China.  Indeed, the parties' agreement provided for arbitration in Hong Kong under Hong Kong law, suggesting to the contrary that payment would be made in Hong Kong.  While

the arbitral award denominated payment in Order 9 in RMB, that did not require payment in China.  RMB is an internationally traded currency that could be paid in any country.

Nonetheless, Yu's argument that the U.S. judgment should be entered in RMB and not U.S. dollars does remain, and it reasonably draws vitality from the arbitral award, which was made in RMB.  As an aside, it is noteworthy that the Estate has indicated that it was willing to have Yu make payment in either RMB or U.S. dollars, although it never requested a judgment in RMB.  But following history and custom, the district court entered judgment in U.S. dollars.  We do not find this to be an abuse of discretion.

Historically, U.S. courts could only render money judgments payable in U.S. dollars.  But today, according to the Restatement of Foreign Relations Law, a judgment can be entered in a foreign currency, but a court should do so "only when requested by the judgment creditor, and only when it would best accomplish the objective stated in Subsection (2)."  Restatement (Third) of Foreign Relations Law § 823 cmt. b (1987).  And Subsection 2, which concerns conversion rates, states in turn, "If, in a case arising out of a foreign currency obligation, the court gives judgment in dollars, the conversion from foreign currency to dollars is to be made at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation."  *Id.* § 823(2).  Under these principles, district courts weigh equitable factors and exercise their discretion to decide the proper currency in which to issue judgment, although that typically results in the court converting a foreign currency award to U.S. dollars.  *See, e.g.*, *BCB Holdings Ltd.*, 232 F. Supp. 3d at 49.

21

Despite the Restatement's acknowledgement that a judgment in a foreign currency *may* be appropriate when requested by the judgment creditor, conversion into dollars at judgment remains the norm. *See Yukos Capital S.A.R.L. v. Samaraneftegaz*, 592 F. App'x 8, 12 (2d Cir. 2014) ("American courts rarely enter judgments in a foreign currency"); *see also BCB Holdings Ltd.*, 232 F. Supp. 3d at 49 ("Conversion of foreign currency into dollars at judgment 'is the norm, rather than the exception'" (quoting *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 158 (D.D.C. 2013), *aff'd*, 603 F. App'x 1 (D.C. Cir. 2015))). Lest there be any doubt, courts have converted monetary awards to U.S. dollars even when, as here, the underlying arbitration award denominates payment in RMB. *See, e.g.*, *High Hope Zhongtian Corp. v. Peking Linen Inc.*, No. 22-CV-7568, 2024 WL 1911116, at *4 (S.D.N.Y. Apr. 15, 2024), *report and recommendation adopted*, 2024 WL 1908436 (S.D.N.Y. May 1, 2024); *Huzhou Chuangtai Rongyuan Inv. Mgmt. P'ship v. Qin*, No. 21-CV-9221, 2022 WL 4485277, at *12 (S.D.N.Y. Sept. 26, 2022), *order corrected on denial of reconsideration*, 2023 WL 2734433 (S.D.N.Y. Mar 31, 2023).

While Yu acknowledges that U.S. courts typically enter judgments in U.S. dollars, she invites us to adopt a uniform rule of entering judgment in the currency the parties chose to deal. She maintains that such a rule would enhance predictability of civil judgments and promote the goal of making injured parties whole, providing them with neither windfall judgments nor unforeseen diminishments.

Those good purposes, however, can still be achieved by entry of judgments in U.S. dollars. With regard to predictability, when parties agree to resolve their contractual

disputes in a foreign arbitral tribunal, they will anticipate that any award arising from that tribunal will be subject to enforcement in accordance with the Convention and the laws of the forum enforcing the award, which could result in a money judgment in a currency different from that in which the parties initially dealt. And with regard to ensuring that the injured party be made whole, the court will, when entering judgment, "assure that neither party receives a windfall or is penalized as a result of currency conversion," whether the creditor requests judgment in a foreign currency or not. Restatement (Third) of Foreign Relations Law § 823 cmt. c. In any event, the district court has discretion to weigh the equities in a given case and assure that neither party be provided with a windfall or unforeseen diminishment.

We conclude that the district court acted reasonably when it entered judgment in dollars, calculated under the currency exchange rate for Order 9 as of the date of the award.

\*      \*      \*

In sum, the Estate requested that the district court confirm and enforce a Hong Kong arbitration award against Yu, pursuant to the New York Convention. Yu, who does not challenge the validity of the award or that she is obligated to pay it, simply presented procedural obstacles. The district court nonetheless confirmed the award and enforced Yu's personal obligation to pay the Estate by issuing a straightforward money judgment, binding on Yu alone and requiring no involvement of absent parties. Because we conclude that the district court appropriately disposed of the obstacles Yu placed before it, we affirm.

AFFIRMED

23