# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 15, 2004                    Decided June 17, 2005

No. 03-7191

TMR ENERGY LIMITED,
APPELLEE

v.

STATE PROPERTY FUND OF UKRAINE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00034)

———

*Thomas J. O'Brien* argued the cause for appellant. With him on the briefs was *Mark N. Bravin*.

*Samuel Rosenthal* argued the cause for appellee. With him on the brief were *Eliot Lauer* and *Scott D. Fischer*.

Before: GINSBURG, *Chief Judge*, and TATEL and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*:  The State Property Fund of Ukraine (SPF) appeals from a judgment in favor of TMR Energy Limited (TMR), a Cyprian corporation, in an action TMR

brought to confirm an arbitration award it obtained against the SPF in Sweden. The SPF claims the district court should have dismissed the case either for want of personal jurisdiction because the SPF did not have minimum contacts with the United States or because the District of Columbia is a *forum non conveniens*. On the merits, the SPF contends the district court should have refused to confirm the arbitration award because the arbitrators' determination of liability exceeded the scope of the arbitration agreement and violated public policy. We reject these arguments and affirm the judgment of the district court.

## I. Background

In 1991, the year the Soviet Union dissolved and Ukraine proclaimed its independence, Lisichansk Oil Refining Works (LOR), a state-owned enterprise, entered into a joint venture with a Swiss company to upgrade an oil refinery located in the eastern region of Ukraine. The Swiss company then transferred to TMR its interest in the joint venture, which was known as Lisoil.

In 1993, TMR entered into two contracts with LOR — one that gave TMR and LOR each a 50% stake in Lisoil and another in which TMR agreed to finance and support the upgrading of several units at LOR's refinery in exchange for LOR's promise to provide feedstock (crude or partially processed oil product) to the upgraded units for refining. Lisoil would own some of the refined oil produced by the upgraded units, and TMR was to be paid out of the proceeds from the sale of that oil. Later in 1993, as part of Ukraine's program of privatization, LOR was transformed into a joint stock company known as Linos. The SPF, which had been created in 1992 to implement Ukraine's privatization plan, retained a 67% share in Linos on behalf of the State of Ukraine.

For several years Linos continued to meet LOR's obligations to Lisoil, but by 1997 Linos was experiencing financial difficulties and stopped providing Lisoil with its share of refined oil; as a result, Lisoil could no longer repay TMR. TMR repeatedly asked Linos to provide Lisoil the refined oil to which it was entitled under the 1993 contract, but Linos refused.

In 1999 TMR and the SPF entered into a contract in which, after declaring that the SPF had succeeded to LOR's 50% interest in Lisoil, they each agreed "not to undertake any actions that may damage the interests of [Lisoil,] ... not [to] abet such actions by a third party and not to [be] inactive in the event of such actions." Shortly after the contract was signed, TMR asked the SPF to fulfill its obligation by causing Linos to turn over to Lisoil the refined oil that LOR had promised in the 1993 contract. The SPF refused to exert any influence over Linos or to provide Lisoil the refined oil itself.

TMR continued to demand the SPF either compensate TMR for its breach of the 1999 contract or find some other solution to the impasse, but the SPF did not respond. Finally, on May 24, 2000 TMR sent the SPF a letter stating that, if the dispute was not resolved by June 3, then TMR would initiate arbitration as provided in the 1999 contract. On July 4 TMR did initiate an arbitration proceeding in Sweden against the SPF, Linos, and the State of Ukraine.

The case against the SPF went to a hearing and in May 2002 the arbitrators held the SPF had breached both the 1993 contract as LOR's successor-in-interest, and the 1999 contract, to which it was a signatory in its own right. The arbitrators awarded TMR $36.7 million in damages, plus interest and costs. In January 2003 TMR filed a petition for confirmation of the award in the United States District Court for the District of Columbia.

## II. Analysis

The SPF argues first that the district court did not have personal jurisdiction over it, and in any event should have dismissed the case under the doctrine of *forum non conveniens*. On the merits, the SPF renews its substantive challenges to the arbitrators' determination of liability.

### A. Personal Jurisdiction

Under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602–1611, a foreign state is "presumptively immune from the jurisdiction of the United States courts," *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); that presumption is overcome only if the plaintiff shows that one of the exceptions to immunity provided in 28 U.S.C. §§ 1605–07 applies. *See id*.; 28 U.S.C. § 1604. The FSIA confers upon district courts subject matter jurisdiction as to "any claim for relief in personam with respect to which the foreign state is not entitled to immunity," 28 U.S.C. § 1330(a), and personal jurisdiction follows where proper "service has been made under § 1608." *Id*. § 1330(b); *see also Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) ("under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction").

The SPF does not dispute that this case comes within 28 U.S.C. § 1605(a)(6)(B), the exception to immunity for any action brought to confirm an arbitration award that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." *See* the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, better known as the New York Convention;

*Creighton Ltd. v. Government of the State of Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999) ("the New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception"). Nor does the SPF argue it was not properly served with process. That resolves the matter of personal jurisdiction insofar as the FSIA is concerned, but the SPF attempts to trump the statute on the ground that the Due Process Clause of the Fifth Amendment to the Constitution of the United States ("No person shall be ... deprived of life, liberty, or property, without due process of law") requires a nexus between it and the forum, here the District of Columbia, where the arbitration award is to be enforced. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (due process requires person not present within forum have "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice"). The SPF argues it lacks the requisite "minimum contacts" because it has had no contact at all with, and has no property in, the United States, let alone the District of Columbia.

This court rejected a similar argument in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (2002). There we held a foreign state is not a "person" as that term is used in the due process clause. *See id.* at 96. We noted first that, "in common usage, the term 'person' does not include the sovereign," and went on to observe that it would make no sense "to treat foreign sovereigns more favorably than 'States of the Union,'" which are decidedly not 'persons' within the meaning of the due process clause. *Id.* (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966)). That is not to say a foreign state is utterly without recourse but only that, "[u]nlike private entities, foreign nations [being] the juridical equals of the government that seeks to assert jurisdiction over them," have available "a panoply of mechanisms in the international arena

through which to seek vindication or redress" if they believe they have been wrongly haled into court in the United States. *Id*. at 98. In short, it is not to the due process clause but to international law and to the comity among nations, as codified in part by the FSIA, that a foreign state must look for protection in the American legal system. *Id*. at 97.

Our holding in *Price* applies only to "an actual foreign government"; we expressly reserved the question "whether other entities that fall within the FSIA's definition of 'foreign state' ... could yet be considered persons under the Due Process Clause." 294 F.3d at 99–100.[*] Accordingly, the SPF argues the rationale of *Price* does not extend to a mere "agency or instrumentality of a foreign state" — which is how the SPF portrays itself — because an agency or instrumentality, unlike a foreign state, is not the "juridical equal" of the United States.

For its part TMR argues that, pursuant to the standard we applied in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (1994), the SPF should not be treated as a legal

---

[*] Section 1603(a) of Title 28 defines a "foreign state" to include, except for the purpose of service of process, "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)," which in turn provides:

> An "agency or instrumentality of a foreign state" means any entity—
> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

personality separate from the State of Ukraine. In *Transaero* we held that for the purpose of determining the proper method of service under the FSIA, an entity that is an "integral part of a foreign state's political structure" is to be treated as the foreign state itself, whereas an entity the structure and core function of which are commercial is to be treated as an "agency or instrumentality" of the state. *Id*. at 151. In this regard TMR argues the SPF performs "classic government functions," such as "implement[ing] national policy," "issu[ing] regulations binding on state agencies of executive power," and "participat[ing] in the development and conclusion of international agreements on property and use of state-owned property." The SPF, in contrast, emphasizes that it "operates in the field of commerce and the dispute underlying this litigation arose out of a commercial transaction," and contends that its status is roughly equivalent to that of a state-owned corporation, which is presumptively considered separate and distinct from the sovereign. *See*, *e.g.*, *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000).

Regardless whether the SPF performs predominantly governmental functions and would therefore be treated as the foreign state itself under the "core functions" test of *Transaero*, or should be treated as a state-owned enterprise because this case arose from a commercial context, we think a different analysis is indicated where the issue is not service of process under the FSIA but whether an agency or instrumentality of a foreign state is entitled to the protection of the due process clause. In *Transaero*, we were concerned with the meaning of the statutory terms "foreign state" and "agency or instrumentality"; here we must decide whether the SPF is a "person" within the meaning of the due process clause of the fifth amendment. To that end we must determine whether the SPF has a constitutional status different from that of the State of

Ukraine, a question with respect to which the Supreme Court's decision in *First National City Bank v. Banco Para el Comercio Exterior de Cuba* (*Bancec*), 462 U.S. 611 (1983), guides our way.

*Bancec* involved an attempt by a bank in the United States to set off the value of its assets seized by the Cuban government against a letter of credit it had issued to Bancec, a bank established and owned by the Government of Cuba but with "full juridical capacity ... of its own." *Id*. at 613. Bancec claimed that, under the FSIA, its separate juridical status shielded it from liability for the actions of the Cuban government. *Id*. The Supreme Court held the FSIA "was not intended to affect the substantive law determining the liability of a foreign state or instrumentality," and looked instead to principles of international law and federal common law to determine whether Bancec could be held liable for the acts of the Cuban government. *Id*. at 620–21. At the outset of that inquiry the Court observed that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," *id*. at 626–27, but it then determined that presumption would be overcome where the foreign state so extensively controlled the instrumentality "that a relationship of principal and agent is created," *id*. at 629, or where — as in the case before it — "adher[ing] blindly to the corporate form ... would cause ... injustice." *Id*. at 632.

In *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (1990), we held the presumption of independent status detailed in *Bancec* also applies to the question of subject matter jurisdiction under the FSIA; that is, a foreign state is amenable to suit based upon an exception in the FSIA and the acts of its instrumentality only if the sovereign exerts "sufficient control

[over the instrumentality] ... to create a relationship of principal to agent." *Id*. at 446–47. We believe the same analysis must govern whether the SPF is a "person" within the meaning of the due process clause: If the State of Ukraine exerted sufficient control over the SPF to make it an agent of the State, then there is no reason to extend to the SPF a constitutional right that is denied to the sovereign itself.

The record in this case shows the State of Ukraine had plenary control over the SPF. The first provision of the regulations approved in the Resolution of the Supreme Rada [Parliament] of Ukraine creating the SPF states, "The [SPF] is a body of the State which implements national policies in the area of privatization." The second provision states, "In the course of its activities, the [SPF] shall be subordinated and accountable to the Supreme Rada .... The activities of the [SPF] shall be governed by the Constitution and legislative acts of Ukraine, the Cabinet of Ministers of Ukraine and these Regulations." Further, the SPF's chairman is "appointed and discharged by the President of Ukraine subject to the consent of the Supreme Rada," and the members of its board must be "approved by the Presidium of the Supreme Rada." Finally, the SPF's expenses are paid from the budget of the State of Ukraine. From these structural features it is apparent that the SPF is an agent of the State, barely distinguishable from an executive department of the government, and should not be treated as an independent juridical entity. Therefore, the SPF — like its principal, the State of Ukraine — is not a "person" for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal jurisdiction of the district court.[*]

---

[*] It is far from obvious that even an independent SPF would be entitled to the protection of the fifth amendment, s*ee United States v.*

The SPF next argues minimum contacts with the forum are a jurisdictional prerequisite under customary international law if not under the due process clause. We shall assume as much, but solely for the sake of the argument, which fails nonetheless. Customary international law comes into play only "where there is no treaty, and no controlling executive or legislative act or

---

*Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("aliens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country"); *see also Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections"), but TMR has not argued the point and hence we express no view upon the question. We note only that, although courts often assume the minimum contacts test applies in suits against foreign "persons," that assumption appears never to have been challenged. *See*, *e.g.*, *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1362 (7th Cir. 1985).

Our holding that the minimum contacts test does not apply also makes it unnecessary to reach TMR's alternative contention that the SPF waived its right to challenge personal jurisdiction because the State of Ukraine is a signatory to the New York Convention. *Cf. Creighton*, 181 F.3d at 123 (quoting, with approval, *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 578 (2d Cir. 1993) ("when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states")).

Furthermore, because the SPF acknowledges that it is an "agency or instrumentality" of the State of Ukraine within the meaning of the FSIA, we have no occasion to consider whether or under what circumstances an entity that is not an "agency or instrumentality" would be without the protection of the fifth amendment because a foreign state exerts control over it.

judicial decision." *The Paquete Habana*, 175 U.S. 677, 700 (1900); *see* J. GOLDSMITH & E. POSNER, THE LIMITS OF INTERNATIONAL LAW 77 (2005) ("political branches have the final say about whether and how [customary international law] applies in the United States and whether or not the United States will comply with it"). Never does customary international law prevail over a contrary federal statute. *See*, *e.g.*, *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988); *United States v. Yousef*, 327 F.3d 56, 91 (2d Cir. 2003).

In this case, the controlling federal statute is 28 U.S.C. § 1330(b): "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." That provision clearly expresses the decision of the Congress to confer upon the federal courts personal jurisdiction over a properly served foreign state — and hence its agent — coextensive with the exceptions to foreign sovereign immunity in the FSIA. We therefore reject the SPF's attempt to condition the jurisdiction of the courts of the United States upon the "minimum contacts" purportedly required under customary international law; we hold the district court properly asserted personal jurisdiction over the SPF based solely upon the requirements of the FSIA.

B.  *Forum Non Conveniens*

The SPF argues that, even if the district court had personal jurisdiction, upon considering the public interest and the interests of the litigants, it should have dismissed this enforcement action under the doctrine of *forum non conveniens*, and remitted the plaintiff to a more appropriate forum. *See Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994). We may

reverse a *forum non conveniens* determination of the district court only for a "clear abuse of discretion." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

According to the SPF, the district court clearly did abuse its discretion because it failed to consider the relevant public and private interest factors favoring dismissal. *See Am. Dredging*, 510 U.S. at 448 (listing some factors). The district court need not weigh any factors favoring dismissal, however, if no other forum to which the plaintiff may repair can grant the relief it may obtain in the forum it chose. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996); *see also Piper Aircraft*, 454 U.S. at 254 n.22.

As the defendant, the SPF has the burden of showing there is another forum adequate to the plaintiff's case. *See El-Fadl*, 75 F.3d at 677. Pointing out that TMR has already filed actions against it in the courts of Sweden and of Ukraine, the SPF contends those courts are adequate to enforce the arbitration award. As TMR notes in response, however, only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States. *See* 28 U.S.C. §§ 1609 (foreign state immune from attachment except as provided in § 1610), 1610(a)(6) (permitting attachment of "property in the United States of a foreign state ... used for a commercial activity in the United States" upon judgment entered by court of the United States or of a state "based on an order confirming an arbitral award rendered against the foreign state").

The SPF next maintains the district court should have dismissed this action because the SPF has no assets in the United States against which a judgment can be enforced. Even if the SPF currently has no attachable property in the United

States, however, it may own property here in the future, and TMR's having a judgment in hand will expedite the process of attachment. In any event, the possibility that the judgment of the district court may go unenforced does not bear upon whether that court is an inconvenient forum in which to defend. The SPF also speculates that TMR's true motive is to go after the property of the State of Ukraine, but TMR's motive is immaterial and whether TMR could properly attach such property is not before us.

Because there is no other forum in which TMR could reach the SPF's property, if any, in the United States, we affirm the district court's refusal to dismiss this action based upon the doctrine of *forum non conveniens*.[*]

C. The New York Convention

The SPF raises three challenges to the arbitration award assertedly based upon Article V of the New York Convention, which enumerates the few reasons for which a court may refuse to enforce an arbitration award and assigns the burden of persuasion to the party opposing enforcement. *See Indus. Risk Insurers v. M.A.N. Gutehoffnungschutte GmbH*, 141 F.3d 1434, 1441–42 (11th Cir. 1998). Because they raise purely legal issues, we address the SPF's arguments *de novo. Id*. at 1443.

Two of the SPF's challenges are based upon Article V.1(c), which provides that enforcement of an arbitration award may be

---

[*] Accordingly, we do not consider TMR's alternative contention that, contrary to the Second Circuit's decision *In re Arbitration Between Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine*, 311 F.3d 488 (2002), the doctrine has no place in an action to enforce an arbitration award.

refused if the "award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." The SPF first contends the arbitrators exceeded the scope of their authority by deciding the SPF was liable under the 1993 agreement, to which it was not a party. As for the 1999 agreement, to which it was a party, the SPF argues it assumed therein only Linos's ownership interest in Lisoil, not Linos's obligations under the 1993 agreement; therefore, the question of liability under the 1993 agreement was not properly before the arbitrators.

TMR points out that, although the arbitrators first held the SPF was liable as LOR's successor-in-interest to the 1993 agreement, they went on to hold the SPF also had duties under the 1999 agreement both to refrain from any activity that might damage the interests of Lisoil and to take an active role in preventing harm resulting from the acts of a third party. In the latter regard the arbitrators found "not a shred of evidence" that the SPF took any action in response to Linos's refusal to turn over the refined oil to which Lisoil was entitled under the 1993 agreement. Therefore, TMR maintains, and we agree, the arbitrators' determination of liability was ultimately grounded in the 1999 agreement, which was properly before them, wherefor we have no authority to second-guess their determination.

The SPF next argues the arbitrators exceeded their jurisdiction because they refused to enforce the provision of the 1999 agreement requiring TMR to initiate the arbitration process within 60 days after it had become clear that the parties could not settle the dispute through negotiation. According to the SPF, the arbitrators rendered a decision outside the bounds of the arbitration agreement when they ignored the choice of law

provision — which called for the application of Ukranian law — and instead applied Swedish law to decide the timeliness of TMR's filing.

TMR responds that the parties disputed the choice-of-law point before the arbitrators, who resolved it in favor of TMR, and the SPF's challenge to the arbitrators' decision is not grounded in one of the bases for non-enforcement listed in Article V of the New York Convention. We agree. The arbitrators explained that, as a procedural question, timeliness was governed by Swedish law, and added that, in any event, "no Ukrainian law brought to their attention ... would change the conclusions reached ... regarding the time limit." As the Supreme Court held in *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), a time limitation for invoking arbitration is the sort of "gateway question," like waiver and delay, that is presumptively for the arbitrator, not the court, to decide. *Id*. at 84–85. The SPF points to nothing in the 1999 agreement that suggests the parties intended to change that presumptive allocation of authority.

Finally, the SPF argues this court should refuse to enforce the arbitration award pursuant to Article V.2(b) on the ground that it violates public policy. Specifically, the SPF contends it could not have compelled Linos to deliver to Lisoil the share of refined oil to which Lisoil was entitled under the 1993 agreement because, from 1996 through the arbitration proceedings, Linos was in bankruptcy; therefore, such delivery would have constituted a preference in violation of Ukrainian bankruptcy law.

This argument attacks a straw man, for the arbitrators did not say the SPF should have caused Linos to deliver oil to Lisoil; indeed they did not specify what action the SPF should have taken in order to satisfy its contractual obligation. Rather,

the arbitrators held the SPF intentionally caused Lisoil harm by doing nothing "to comply with or ... to make Linos ... comply with" the 1993 agreement. In any event, as TMR observes, the arbitrators could only presume, and expressly did presume, the SPF knew of the legal constraints imposed upon Linos by Ukrainian bankruptcy law when it signed the 1999 agreement with TMR; therefore, they held the SPF breached the contract by "put[ting] itself in such a situation of conflicting duties and choos[ing] to refrain from action" that could have mitigated the harm to Lisoil's economic interest.

In sum, the SPF has not shown that Article V of the New York Convention provides any ground for non-enforcement of the arbitration award. Accordingly, we hold the district court correctly entered judgment against the SPF.

### III. Conclusion

We hold the district court had personal jurisdiction over the SPF under the arbitration exception to foreign sovereign immunity in the FSIA. The minimum contacts requirement of the due process clause does not apply to the SPF because, as an agent of the State of Ukraine, the SPF is not a juridical entity distinct from the State itself, and is therefore not a "person" within the meaning of the fifth amendment.

We also hold the district court did not abuse its discretion in denying the SPF's motion to dismiss under the doctrine of *forum non conveniens* nor, when it turned to the merits of the case, did it err in rejecting the SPF's challenges to enforcement of the arbitration award under Article V of the New York Convention. For these reasons, the judgment of the district court is

*Affirmed*.