# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 1, 2025                    Decided October 3, 2025

No. 24-7161

HELMERICH & PAYNE INTERNATIONAL DRILLING CO.,
APPELLEE

v.

PETROLEOS DE VENEZUELA, S.A. AND PDVSA PETROLEO,
S.A.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01735)

———

*Juan O. Perla* argued the cause for appellants. With him
on the briefs were *David V. Holmes*, *Joseph D. Pizzurro*, and
*Kevin A. Meehan.*

*Matthew S. Rozen* argued the cause for appellee. With him
on the brief were *Miguel A. Estrada*, *Jeffrey Liu*, and *Aaron
Hauptman*.

Before: MILLETT, KATSAS, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Katsas.

KATSAS, *Circuit Judge*:  In 2010, Venezuela expropriated assets of the Venezuelan subsidiary of a United States energy company.  The assets are now operated by a state-owned Venezuelan energy company.  The American company sued in the United States and invoked the expropriation exception to foreign sovereign immunity.  The Venezuelan company moved to dismiss based on immunity, lack of personal jurisdiction, and the act-of-state doctrine.  The district court rejected all of these defenses and denied the motion to dismiss.  We affirm across the board.

I

A

Historically, the United States granted foreign sovereigns "complete immunity" in its courts as "a matter of grace and comity."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983).  But as foreign governments became more involved in commercial activity, the immunity became more limited.  In 1952, the State Department adopted a "restrictive" view under which foreign sovereigns are generally immune for their public, sovereign acts but not for private, commercial acts.  *See id.* at 486–87; *Republic of Hungary v. Simon*, 604 U.S. 115, 119 (2025).

The restrictive theory spawned questions about state responsibility for taking property owned by foreign nationals.  That question was presented in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), which arose when Cuba expropriated sugar belonging to a Cuban company owned by Americans.  Applying the act-of-state doctrine, the Supreme Court refused to "examine the validity of a taking of property within its own territory by a foreign sovereign government ... in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint

alleges that the taking violates customary international law." *Id.* at 428. The act-of-state doctrine, which applies to the "public acts" of foreign sovereigns "within their own borders," gives foreign sovereigns a "substantive defense on the merits" rather than a jurisdictional immunity from suit. *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004); *see* Restatement (Fourth) of Foreign Relations Law § 441 (2018) (Fourth Restatement).

In response to *Sabbatino*, Congress enacted the Second Hickenlooper Amendment, which prohibits courts from applying the act-of-state doctrine "in a case in which a claim of title or other rights to property is asserted by any party … based upon (or traced through) a confiscation or other taking" by a state in violation of international law. 22 U.S.C. § 2370(e)(2). Courts and commentators broadly understood the Amendment "to permit adjudication of claims the *Sabbatino* decision had avoided—claims against foreign nations for expropriation of American-owned property." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 179 (2021). But the Amendment did not purport to alter what is known as the domestic-takings rule, under which a foreign sovereign does not violate international law by taking the property of its own nationals within its own borders. *See id.* at 179–80.

Despite the Second Hickenlooper Amendment, courts continued to struggle in applying the restrictive theory of immunity. Many asked the Department of State to file suggestions of immunity. *See* Restatement (Second) of the Foreign Relations Law of the United States § 71(1)–(2) & cmt. a (1965). But that proved burdensome for the Department and produced inconsistent rulings in cases where it was not involved. *See* Restatement (Third) of the Foreign Relations Law of the United States Part IV.5.A intro. note (1987).

4

Against this backdrop, Congress enacted the Foreign Sovereign Immunities Act (FSIA) to standardize the courts' immunity determinations. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023). The FSIA makes foreign states "immune from the jurisdiction" of American courts unless an enumerated exception applies. 28 U.S.C. § 1604. This appeal turns on the FSIA's expropriation exception.

B

The expropriation exception abrogates foreign sovereign immunity in any case

> in which rights in property taken in violation of international law are in issue and [1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). The elements of the exception thus vary depending on whether the foreign state itself, or one of its agencies or instrumentalities, owns the unlawfully expropriated property. When the foreign state owns it, the property (or other property exchanged for it) must be present in the United States in connection with commercial activity by the foreign state. *See id.* (prong 1). When an agency or instrumentality owns the expropriated property (or other property exchanged for it), the agency or instrumentality must be engaged in commercial activity in the United States. *See id.* (prong 2). Under prong 2, it suffices to overcome immunity if (1) the foreign state takes property in violation of international

law, (2) one if its agencies owns or operates the property, and (3) that agency engages in commercial activity in the United States.

The FSIA defines a "foreign state" to include "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). It then defines the latter term as any entity that is a separate legal person, is owned by the foreign state, and is neither a United States citizen nor created under the laws of any third country. *Id.* § 1603(b). Like the expropriation exception, many FSIA provisions afford greater protection to foreign states than they do to agencies or instrumentalities of foreign states. *See*, *e.g.*, *id.* § 1606 (immunity from punitive damages); *id.* § 1610(b) (attachment immunity).

II

A

Helmerich & Payne International Drilling Co., which we call Helmerich, is a United States energy company. Helmerich wholly owns Helmerich & Payne de Venezuela, C.A, a Venezuelan company that we call Helmerich (Venezuela). For decades, Helmerich (Venezuela) provided services to Petróleos de Venezuela, S.A. (PDVSA), a Venezuelan energy company wholly owned by the Bolivarian Republic of Venezuela. Helmerich (Venezuela) owned various property in Venezuela, including large rigs suitable for drilling oil and gas wells there.

In the early 2000s, the relationship between Helmerich (Venezuela) and PDVSA soured. PDVSA began defaulting on its contractual obligations to Helmerich (Venezuela), racking up some $90 million in unpaid invoices for drilling services. In 2009, Helmerich announced that it would wind down its Venezuelan operations, and Helmerich (Venezuela) began to disassemble its rigs.

Conditions further deteriorated in 2010. PDVSA employees and the Venezuelan National Guard blockaded the drilling operations of Helmerich (Venezuela) to prevent removal of the rigs. PDVSA issued press releases claiming to have "nationalized 11 drilling rigs" belonging to Helmerich (Venezuela), which it said would henceforth be "operated by PDVSA as a company of all Venezuelans." J.A. at 50, 54. A PDVSA official confirmed that "[t]he workers are guarding the drills." *Id.* at 51. The Venezuelan National Assembly issued an official declaration recommending that the property be expropriated for the "public benefit and good." *Id.* at 51, 91. And President Hugo Chávez issued a "Decree of Expropriation" ordering Helmerich (Venezuela) to transfer the rigs to PDVSA under a Venezuelan "Law of Expropriation." *Id.* at 51, 100. PDVSA then began using Helmerich (Venezuela)'s rigs and other assets to drill.

B

Helmerich and its Venezuelan subsidiary sued Venezuela and PDVSA in our district court. They alleged that Venezuela had unlawfully expropriated their property.

Venezuela and PDVSA moved to dismiss. The district court denied the motion in relevant part, *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 971 F. Supp. 2d 49 (D.D.C. 2013) (*Helmerich I*), and we affirmed, *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804 (D.C. Cir. 2015) (*Helmerich II*). We reiterated our view that the plaintiff, to trigger the FSIA's expropriation exception, need only state a "non-frivolous" claim of an unlawful international expropriation. *Id.* at 812.

The Supreme Court rejected that standard, vacated our decision, and remanded. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017)

(*Helmerich III*). The Court held that the expropriation exception applies only if a court finds "that the property in which the party claims to hold rights was indeed property taken in violation of international law." *Id.* at 174 (cleaned up).

Applying that standard on remand, we held that Helmerich alleged facts supporting the expropriation exception, but Helmerich (Venezuela) did not. *See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 453–55 (D.C. Cir. Aug. 7, 2018) (*Helmerich IV*). We rejected the Venezuelan subsidiary's expropriation claim under the domestic-takings rule, under which international law does not govern a state's taking of its own nationals' property. *Id.* at 448. But we concluded that Helmerich—an American company—had stated a valid international claim keyed to the taking of its own property. *Id.* at 455. We recognized two distinct property interests underlying that claim: Helmerich's ownership interest in its subsidiary and its right under Venezuelan law to control the subsidiary's disposition of the expropriated assets. *See id.*

We explained that international law recognizes a shareholder's ownership interest in a corporation and protects it from direct and indirect expropriations. *Helmerich IV*, 743 F. App'x at 453–54. A foreign state can directly expropriate shares by formally divesting a shareholder of them. *Id.* at 454. It can also expropriate shares indirectly, by taking "measures that have an effect equivalent to a formal expropriation." *Id.* (cleaned up). We were careful to note that "not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation." *Id.* But we agreed with the United States about one circumstance when an indirect expropriation will occur:

> [W]hen a state permanently takes over management and control of [a foreign shareholder's] business, completely destroying the beneficial and productive value of the shareholder's ownership of their company, and leaving the shareholder with shares that have been rendered useless, it has indirectly expropriated the ownership of that business and has responsibility under customary international law to provide just compensation to the shareholder.

*Id.*

Applying that test, we had "little trouble concluding" that Helmerich adequately alleged that Venezuela had unlawfully expropriated the "entire business" of its Venezuelan subsidiary by taking it over and rendering Helmerich's ownership interest useless. *Helmerich IV*, 743 F. App'x at 455. We reserved judgment on the legal validity of Helmerich's second expropriation theory—that PDVSA expropriated its rights under Venezuelan law to control the assets of Helmerich (Venezuela). *Id.* at 456. We remanded to the district court for further factual and legal development of these claims. *Id.*

After we decided *De Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017), the district court dismissed Venezuela as a defendant. *De Csepel* clarified that a suit against a foreign state (as opposed to its instrumentalities) can be maintained under the expropriation exception only if the property taken, or property exchanged for it, is present in the United States. *See id.* at 1106–07. Helmerich has not challenged that ruling.

9

C

After jurisdictional discovery on remand, PDVSA moved to dismiss on grounds of immunity, lack of personal jurisdiction, and the act-of-state doctrine. The district court denied the motion. *Helmerich & Payne Int'l Drilling Co. v. Petróleos de Venezuela, S.A.*, 754 F. Supp. 3d 29 (D.D.C. 2024) (*Helmerich V*). PDVSA appealed.

III

We begin with the question of our jurisdiction to hear this interlocutory appeal. We have jurisdiction to review the denial of foreign sovereign immunity under the collateral-order doctrine. *See Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 939 (D.C. Cir. 2008). And when exercising that jurisdiction, we routinely consider pendent claims challenging refusals to dismiss for lack of personal jurisdiction. *See*, *e.g.*, *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002).

We also have pendent appellate jurisdiction to review the denial of PDVSA's act-of-state defense. We may exercise such jurisdiction, as a matter of discretion, when a "nonappealable order is inextricably intertwined with the appealable order, or when review of the former is necessary to ensure meaningful review of the latter." *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 765 (D.C. Cir. 2023) (cleaned up); *see also Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995). As a merits defense, the act-of-state doctrine does not by itself support an interlocutory appeal. *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 855 (D.C. Cir. 2000). But here, the act-of-state issue is inextricably intertwined with the sovereign-immunity issue. As the Supreme Court has made

clear, the act-of-state doctrine and the Second Hickenlooper Amendment are critical to interpreting the scope of the expropriation exception, for those provisions are linked both textually and historically. *See Simon*, 604 U.S. at 132. In particular, a common question under both the expropriation exception and the act-of-state doctrine is whether the expropriation violated international law. Moreover, the default statutory immunity reflects a strong preference for resolving threshold issues about a foreign sovereign's susceptibility to suit in United States courts as early as possible in the litigation. *See Process & Indus. Devs. v. Federal Republic of Nigeria*, 962 F.3d 576, 581 (D.C. Cir. 2020). Although the threshold nature of the act-of-state doctrine will not always warrant an exercise of pendent appellate jurisdiction by itself, its close overlap with the appealable immunity question here counsels in favor of exercising pendent appellate jurisdiction in this case.

IV

With regard to the jurisdictional immunity and the personal-jurisdiction questions, we review the district court's findings of fact for clear error. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004) (FSIA); *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001) (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 150–51 (2d Cir. 2001) ("The standard of review applicable to district court decisions regarding personal jurisdiction is clear error for factual findings.")). We review *de novo* whether those facts suffice to divest a sovereign of immunity, *Price*, 389 F.3d at 197, and to confer personal jurisdiction over the sovereign, *Saint-Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*, 23 F.4th 1036, 1040 (D.C. Cir. 2022).

As explained below, the question whether the act-of-state doctrine applies in this case turns on legal questions regarding the breadth of the Second Hickenlooper Amendment. Our review of such legal questions is *de novo*. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 34 F.4th 1, 9 (D.C. Cir. 2022).

A

We agree with the district court that the expropriation exception applies because (1) Venezuela indirectly took Helmerich's property in violation of international law, (2) PDVSA owns and operates that property, and (3) PDVSA engages in commercial activity in the United States. 28 U.S.C. § 1605(a)(3).

1

In *Helmerich IV*, we explained that international law protects against the "indirect" expropriation of shareholders' ownership interests through "measures that have an effect equivalent to a formal expropriation … even if the state does not formally divest the shareholder of its shares." 743 F. App'x at 454 (cleaned up). We held that such an indirect expropriation occurs if a foreign state permanently takes over "management and control" of the company and leaves its owners "with shares that have been rendered useless." *Id.*

Helmerich contends that Venezuela unlawfully took two of its protected property interests—its ownership interest in Helmerich (Venezuela) and its right to dispose of that subsidiary's assets. The district court credited both of these allegations, as do we.

After extensive review of the evidence produced in discovery, the district court found that Venezuela took the "entire business" of Helmerich (Venezuela) to operate it "as a

state-owned enterprise." *Helmerich V*, 754 F. Supp. 3d at 39. The court carefully reviewed the official declarations and other evidence showing that Venezuela and PDVSA forcefully acquired the drilling rigs and other assets of Helmerich (Venezuela). *See id.* at 39–40. The court looked to asset inventories, declarations, and depositions to conclude that Helmerich (Venezuela) no longer possessed any usable property. *See id.* Thus, while that company "still exists as a corporate legal entity, the record is clear that it no longer engages in commercial operations." *Id.* at 40. And because Helmerich (Venezuela) no longer has any revenue-generating business, Helmerich's shares in its subsidiary have been rendered worthless. *See id.* at 40–41. The district court thus applied the correct legal standard, and PDVSA fails to show that its factual determinations were clearly erroneous.

PDVSA points to Helmerich's tax filing, which states that Helmerich (Venezuela) retained $105 million in "assets" beyond the value it derived from the rigs. J.A. 435. But these were assets in name only. They included $24.3 million in expropriated property, $42.5 million in accounts payable from PDVSA that it had to write off, and $30.7 million housed in a Venezuelan bank account that it could not recover. *See id.*; *see also id.* at 1238–39 (annual report noting a loss of $70.2 million from derecognition of Venezuelan property and equipment). These line items reflect unattainable assets or losses. They do not disturb the conclusion that Helmerich (Venezuela) is no longer generating any productive value.

PDVSA also argues that Helmerich continues to appoint its subsidiary's directors and officers, vote its shares, supervise various legal actions, and recover on arbitration claims. However, Helmerich appointed directors and held shareholder meetings only to ensure compliance with Venezuelan law as it wound down the Venezuelan subsidiary. J.A. 1433. And as

the district court noted, doing so did not generate any value. *Helmerich V*, 754 F. Supp. 3d at 40–41. Moreover, the arbitration recovery arose from Helmerich's rights and was paid to that company; it was not value that Helmerich (Venezuela) produced.

PDVSA heavily relies on *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12 (D.C. Cir. 2024), but it is inapposite. In *Exxon*, we addressed whether Cuba violated international law by taking property owned by a Cuban subsidiary of Exxon. *See id.* at 21, 27. Quoting *Helmerich IV*, we noted that "under the international law of expropriation, 'not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation of the shareholder's ownership rights.'" *Id.* at 27 (quoting 743 F. App'x at 454). And we reiterated *Helmerich IV*'s holding that a taking destroying the productive value of a shareholder's ownership interest is an unlawful indirect expropriation. *Id.* at 28–29. In *Exxon*, we held that this test was not satisfied. For starters, Exxon forfeited its argument that Cuba had destroyed the "entire value" of its subsidiary's operations—precisely the claim that Helmerich presses here. *Id.* Additionally, Exxon's subsidiary continued to operate fuel stations, appeared in a public registry's list of businesses in good standing, and continued to hold annual board and shareholder meetings. *Id.* For these reasons, we held that there was no indirect expropriation under *Helmerich IV*. *See id.* But the facts here, which show that Helmerich (Venezuela) does not continue to operate anything, are materially different.

The district court also held that PDVSA took Helmerich's right under Venezuelan law to control its subsidiary's assets. *Helmerich V*, 754 F. Supp. 3d at 44. PDVSA does not challenge the merits of this ruling.

2

The next question is whether PDVSA owns or operates the expropriated property. That turns on whether PDVSA "possessed or exerted control or influence over" it. *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 481 (D.C. Cir. 2007). When a taking "extinguish[es]" a property right, this requirement is not met. *Id.*

The district court found that PDVSA owns and operates the business of Helmerich (Venezuela). *See Helmerich V*, 754 F. Supp. 3d at 44. Specifically, PDVSA "assumed operation and control" of the business by possessing and operating its productive assets, especially its specialized drills. *See id.* at 39–41, 45–46. A PDVSA official testified that he "receive[d]" these assets, showing that PDVSA possessed and thus owned them. *Id.* at 45. And PDVSA also operates the business by exerting control over the assets—in fact, PDVSA's President at the time of the expropriation stated the Chávez regime "was taking control over this drill company." *Id.* at 40 (cleaned up). Thus, the court reasoned that because PDVSA controls all Helmerich (Venezuela)'s productive assets and uses them for drilling, it effectively owns and operates Helmerich (Venezuela)'s business. *Id.* at 44–45. Again, the court identified the correct legal standard and did not clearly err in applying it.

PDVSA objects that the expropriation extinguished Helmerich's ownership rights in its Venezuelan subsidiary. True enough, but Venezuela did not take the assets to destroy them. Instead, the record shows that the nationalization transferred the assets to PDVSA, which operates them for its own benefit. *See Helmerich V*, 754 F. Supp. 3d at 45–46.

The district court reached the opposite conclusion regarding Helmerich's right to control the disposition of these

assets. The court appeared to assume that the nationalization of Helmerich (Venezuela) extinguished any property right to control the disposition of its assets. *See Helmerich V*, 754 F. Supp. 3d at 46. But the nationalization did not extinguish any power to control the disposition of the nationalized assets. Instead, it transferred those rights to PDVSA, which now controls and operates the assets. Helmerich's second takings theory also suffices to trigger the expropriation exception.

PDVSA argues Helmerich forfeited this argument by failing to cross-appeal. We disagree. An appellee may defend a judgment on any ground supported by the record, so long as it does not seek to enlarge its rights under the existing judgment. *Jennings v. Stephens*, 574 U.S. 271, 276–77 (2015). Here, the judgment under review simply rejected PDVSA's asserted immunity, and the alternative property interest claimed by Helmerich merely provides a different basis for doing so. Because this alternative theory does not enlarge Helmerich's rights, we may consider it as a basis for rejecting immunity.

3

The district court next concluded that PDVSA is engaged in various commercial activities in the United States. *Helmerich V*, 754 F. Supp. 3d at 46–47. For example, PDVSA maintains commercial supply contracts with U.S. entities such as CITGO Petroleum Corporation and holds "significant commercial property interests in the United States." *Id.* PDVSA does not seriously challenge these findings, which are amply supported by the record.

B

PDVSA next contends that the district court erred in exercising personal jurisdiction over it. The FSIA provides that

"[p]ersonal jurisdiction over a foreign state shall exist" for every claim subject to an immunity exception, so long as the foreign sovereign has been properly served. 28 U.S.C. § 1330(b). We have already held that the expropriation exception applies to the claims at issue here, and PDVSA does not claim to have been improperly served. As a statutory matter, that is the end of our inquiry.

PDVSA nonetheless objects that the Fifth Amendment bars the exercise of personal jurisdiction in this case. PDVSA invokes due-process limits on the exercise of personal jurisdiction contained in Fourteenth Amendment precedents. After this case was briefed and argued, the Supreme Court held that the Fifth Amendment imposes different restrictions on the exercise of personal jurisdiction than does the Fourteenth. *See Fuld v. PLO*, 606 U.S. 1, 16 (2025). PDVSA's arguments thus may fail because they invoke Fourteenth Amendment standards. But regardless of that question, we have held that the Fifth Amendment affords no protection to foreign states, *Price*, 294 F.3d at 96, or to instrumentalities that are the "alter ego" of a foreign state, *see GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012).

To determine whether a foreign corporation is an alter ego of a foreign state, we look to *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). In *Bancec*, the Supreme Court held that government corporations established as separate legal persons are generally treated as entities separate from the government itself. *See id.* at 626–27. However, the opposite rule applies when the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." *Id.* at 629. To evaluate that question, courts consider

(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 210 (2018) (cleaned up); *accord GSS Grp.*, 680 F.3d at 815; *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 300 (D.C. Cir. 2005).

We see no basis for disturbing the district court's conclusion that PDVSA is the alter ego of Venezuela for constitutional purposes. The district court articulated the correct legal test identified above. *See Helmerich V*, 754 F. Supp. 3d at 47–48. And after jurisdictional discovery, the court painstakingly reviewed the evidence supporting an alter-ego determination under each of the relevant factors, in an analysis spanning some four pages of the Federal Supplement. *See id.* at 48–51. Among other things, the court cited PDVSA's own statements that it is "controlled by the Venezuelan government, which ultimately determines [its] capital investment and other spending programs." *Id.* at 48. The court also explained how Venezuela sets PDVSA's annual budget and compels it to maintain its funds in foreign currency. *See id.*

PDVSA does not come close to establishing that the district court's alter-ego determination is wrong, or the subsidiary findings that underlie it are clearly erroneous. In two short paragraphs of argument, PDVSA contends that the district court erred in mentioning considerations of ordinary

shareholder control and of Venezuela's actions as a regulator. But as explained above, the district court considered much more than just that. PDVSA further suggests that these two considerations are legally irrelevant—and that even mentioning them fatally infected the district court's much broader analysis of control. PDVSA cites *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843 (D.C. Cir. 2000), where we held that owning a majority of shares and appointing a board of directors was insufficient to establish alter-ego status. *See id.* at 849. At the same time, we noted that these considerations were "relevant" to an alter-ego determination, though not sufficient "by themselves." *Id.* at 851. And we reaffirmed that "[t]he question [of sovereign control over an instrumentality] defies resolution by 'mechanical formula[e],' for the inquiry is inherently fact-specific." *Id.* at 849 (quoting *Bancec*, 462 U.S. at 633). *Transamerica* does not undercut the district court's fact-intensive finding of sufficient control here.

We note that the Third Circuit has also held that PDVSA is an alter ego of Venezuela. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 146–49 (3d Cir. 2019). In *Crystallex*, PDVSA "effectively conceded" that Venezuela extensively controls it. *See id.* at 146. And the Third Circuit evaluated the *Rubin* factors, found them satisfied, and did not view the question as close. *See id.* at 152 ("[I]f the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can."). The Third Circuit's analysis is persuasive and reinforces the district court's alter-ego holding.

Finally, PDVSA argues that if the district court's alter-ego finding is correct, then for FSIA purposes it must be treated as Venezuela itself, not as an agency or instrumentality of Venezuela. The FSIA defines an "agency or instrumentality"

of a foreign state as an entity that is a "separate legal person" from the state itself. 28 U.S.C. § 1603(b). PDVSA reasons that if it is treated just like Venezuela for Fifth Amendment purposes, then it must be treated just like Venezuela for FSIA purposes. And that would cinch up its jurisdictional immunity, PDVSA concludes, given the absence of any evidence that the property taken from Helmerich, or any property exchanged for it, "is present in the United States." *Id.* § 1605(a)(3).

Hemerich's inconsistency argument is mistaken, because the constitutional and statutory tests are different. As explained above, the constitutional test for alter-ego status turns on the extent to which the sovereign controls a legally separate entity like a government-owned corporation. *See, e.g.*, *Bancec*, 462 U.S. at 626–27; *TMR Energy*, 411 F.3d at 301. In contrast, when distinguishing between a foreign sovereign and an agency or instrumentality for FSIA purposes, we consider whether the entity's "core functions are governmental or commercial." *De Csepel v. Republic of Hungary*, 27 F.4th 736, 744 (D.C. Cir. 2022) (cleaned up); *see Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). The tests serve different purposes, and there is nothing unusual, much less inherently contradictory, in concluding that a foreign sovereign completely controls a legally separate entity that is engaged in primarily commercial activities. Finally, in *TMR Energy*, we specifically held that the foreign entity at issue was both an "agency or instrumentality of a foreign state" for FSIA purposes and an alter-ego of that state for purposes of the Fifth Amendment. 411 F.3d at 300, 302. So too here.

C

Finally, PDVSA argues that the act-of-state doctrine bars Helmerich's expropriation claim. That doctrine prevents courts "from inquiring into the validity of the public acts a

recognized foreign sovereign power committed within its own territory." *Sabbatino*, 376 U.S. at 401. However, the Second Hickenlooper Amendment bars application of the act-of-state doctrine in cases where "a claim of title or other rights to property is asserted by any party … based upon (or traced through) a confiscation or other taking" in violation of international law. 22 U.S.C. § 2370(e)(2). The district court held that the Amendment governs here. We agree.

PDVSA contends that the Amendment does not cover claims for damages. It reasons that a "claim of title" refers to a dispute regarding ownership, so a claim of "other rights to property" must likewise involve a dispute regarding ownership. And damages claims, it says, do not involve disputes regarding ownership. We reject this contention. As a textual matter, the phrase "other rights to property" fits this case perfectly. As explained above, the district court permissibly concluded that Venezuela took two distinct property rights of Helmerich in violation of international law.

PDVSA invokes the interpretive canons of *ejusdem generis* and *noscitur a sociis* to contend that the phrase "claim of title" must restrict the adjacent phrase "other rights to property." But neither canon is a good fit. The *ejusdem generis* canon requires "a catchall phrase at the end of an enumeration of specifics, as in *dog, cats, horses, cattle, and other animals.*" A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012); *see Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021). Here, the catchall phrase "other rights to property" is preceded not by a list of terms with some common trait, but merely by the phrase "claim of title." Similarly, for the *noscitur* or associated-words canon to apply, the relevant terms "must be conjoined in such a way as to indicate that they have some quality in common." A. Scalia & B. Garner, *supra*, at 196; *see Overdevest*, 2 F.4th at

983. Again, conjoining disputes over "claim of title" with disputes over "other rights to property" suggests no common quality other than property disputes. Moreover, nothing in either phrase suggests a limitation to injunctive actions for the return of property as opposed to damages actions for just compensation. And such a limitation would be wildly implausible in this context because international law, like the domestic Takings Clause, does not generally prohibit governments from taking private property, but instead merely requires that they afford just compensation. Restatement (Third) of Foreign Relations Law § 712(1) cmt. c (1987) ("International law requires that a taking of the property of a foreign national, whether a natural or juridical person, be compensated."). So it would make no sense for Congress to greenlight a null set of claims to enjoin takings conducted by foreign sovereigns abroad, but to maintain a bar on damages claims seeking just compensation for the same group of takings. Ultimately, we think that "other rights to property" simply means asserted property rights beyond claims of title— and certainly does not mean injunctive but not damages actions.[1]

PDVSA also argues that the Second Hickenlooper Amendment applies only in cases where the expropriated property is present in the United States. But the Amendment contains no such reference to the United States or any other

---

[1] If disputes about "other rights to property" just means property disputes, then the phrase "claims of title" would serve merely to highlight one particularly obvious example of a "right in property." Sometimes Congress drafts statutes containing redundancies, for the sake of a "belt-and-suspenders approach." *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017) (cleaned up). And here, with a single three-word phrase ("claim of title") followed by an express catchall phrase ("other rights to property"), there is at most minimal surplusage.

location.  *See* 22 U.S.C. § 2370(e)(2).  In this respect, it differs strikingly from the expropriation exception, which on its face requires some connection between the disputed taking and commercial activity in the United States.  *See* 28 U.S.C. § 1605(a)(3) (property must be "present in the United States in connection with a commercial activity carried on in the United States by the foreign state" or must be owned or operated by an instrumentality "engaged in a commercial activity in the United States").  As *Simon* explained, the domestic "limitation" in the expropriation exception simply is "not found in the Second Hickenlooper Amendment."  604 U.S. at 122.  We recognize that some older cases have read a domestic-nexus requirement into the Amendment based on statements from congressional hearings.  *See Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.*, 431 F.2d 394, 400–02 (2d Cir. 1970); *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th Cir. 1982).  But given the textual considerations that we have addressed, and the lessened significance of legislative history as an interpretive consideration since those cases were decided, we do not find them persuasive.  *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019).

With no textual support for its proposed limitation, PDVSA retreats to the presumption that federal statutes do not apply extraterritorially.  *See Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 255 (2010).  The Second Hickenlooper Amendment restricts courts from applying the act-of-state doctrine, which applies only to acts committed by foreign sovereigns within their own territories.  *See W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990); *Sabbatino*, 376 U.S. at 401.  The Amendment thus applies exclusively to foreign takings, which is enough to rebut the presumption against extraterritoriality.  *See RJR Nabisco v. European Community*, 579 U.S. 325, 337 (2016).

For these reasons, Helmerich is correct that the Second Hickenlooper Amendment bars application of the act-of-state doctrine to its expropriation claim here.

## V

We affirm the denial of PDVSA's motion to dismiss.

*So ordered.*